**Carl BASS, Petitioner-Appellant,**

v.

**L. B. SULLIVAN, Commissioner of the State of Alabama Board of Correction, et al., Respondents-Appellees.**

No. 76–1069.

United States Court of Appeals, Fifth Circuit.

April 7, 1977.

---

230

Richard H. Gill, Montgomery, Ala. (Court appointed), for petitioner-appellant.

William J. Baxley, Atty. Gen., Eric A. Bowen, Asst. Atty. Gen., Charles A. Stakely, Jr., Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for respondents-appellees.

Before GEWIN, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

In December of 1974, Carl Bass escaped from an Alabama prison and remained at large in the countryside in near and subfreezing temperatures for a week before being recaptured. In obedience to established policy, prison authorities first took him immediately to the prison system's Mt. Meigs hospital facility, where he was found to be suffering from general exhaustion and from swollen feet and ankles. A course of treatment commenced, but within two weeks it became necessary to amputate both of his legs at or about the knee. This suit, in which Bass invokes 42 U.S.C. § 1983 to claim damages for cruel and unusual punishment resulting from denial of medical care, followed. After a bench trial, the district court denied all relief. Bass' major points on appeal address the standard of liability applied by the trial court and the sufficiency of the evidence to sustain its findings. To these we now turn.

### Denial of Medical Care as Cruel and Unusual Punishment.

The Supreme Court has recently written definitively on this subject. *Estelle v. Gamble*,[1] like this case, was a § 1983 civil rights action against a prison physician and other officials claiming cruel and unusual punishment by inadequate treatment. Reversing our panel, the Court upheld the District Court's dismissal of Gamble's *pro se* complaint against the physician as alleging, at most, malpractice and insufficient to state a claim under 42 U.S.C. § 1983.

The Court commenced its analysis by re-iterating the test for cruel and unusual punishment: whether the conduct in question runs counter to evolving standards of decency or involves the unnecessary and wanton infliction of pain.[2] Noting likewise that a prisoner, being disabled to provide

---

1. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

2. 429 U.S. at 102, 97 S.Ct. at 290, 50 L.Ed.2d at 259.

for his own medical care, is entitled to such care from the public, the Court concluded that "deliberate indifference" to a prisoner's serious illness or injury would give rise to a § 1983 claim.[3]  No less will do:

".  .  .  an inadvertent failure to provide adequate medical care cannot be said to constitute a 'wanton infliction of unnecessary pain' or to be 'repugnant to the conscience of mankind.'  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[4]

In a footnote to the passage quoted, the Court observes that the various Courts of Appeal broadly agree with the Court's "deliberate indifference" standard.  Various cases are cited, that from this circuit being *Newman v. Alabama,* 503 F.2d 1320 (1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) ("callous indifference").

■  Had the district court applied the "callous indifference" standard of *Newman,* we would without difficulty conclude that a test in essential agreement with *Gamble* had been employed.  The court chose instead to quote at length from the *district* court opinion in *Newman* and to enunciate as its test that of *Novak v. Beto,*[5] an older authority.  *Novak* inquires whether there was such a neglect of plaintiff's basic medical needs as justly to be termed barbarous or shocking to the conscience.  Whether *Novak's* barbarous/shocks-the-conscience

test is "in essential agreement" with the deliberate indifference test of *Gamble* seems to us a close question at first blush.  In the same footnote which mentions *Newman,* however, the Supreme Court cites Ninth and Tenth Circuit cases which employ the *Novak* standard [6] as illustrations of the circuits' essential agreement among themselves.  In view of this, though of course the Supreme Court's formulation should henceforth be used, we conclude that the test applied by the district court was, though not the best formulation, a permissible one.

### Bass' treatment: deliberate indifference?

■  We observe at the outset that there is little ground upon which to rest a conclusion of *indifference* by the treating physician, Dr. Baranowski.  It is possible on this record to argue carelessness;  it is possible to argue the deliberate creation of a charade or simulacrum of treatment insidiously designed to injure rather than to cure;  but it is very difficult to make even a colorable showing of indifference.  Dr. Baranowski saw Bass on either the first or second day after his return and virtually every day thereafter.  By his instructions, Bass received whirlpool and heat-cradle treatments, intravenous infusions, drugs designed to increase circulation in his affected members, two antibiotics (though in very moderate dosages), analgesic pain relievers, oxygen for a respiratory problem, and on occasion a tranquilizer.  He was under the care of at least three different licensed professional nurses, apparently having one in sole attendance on him most of the time after the seriousness of his condition became apparent.  The orders governing his treatment were changed from time to time by Dr. Baranowski and finally, when hope was lost, Dr. Baranowski arranged for the necessary operation to remove his gangre-

**3.**  *Ibid.*

**4.**  429 U.S. at 105, 97 S.Ct. at 292, 50 L.Ed.2d at 261.

**5.**  453 F.2d 661 (5th Cir. 1971).

**6.**  *Tolbert v. Eyman,* 434 F.2d 625 (9th Cir. 1970);  *Dewell v. Lawson,* 489 F.2d 877 (10th Cir. 1974).

nous legs. All this took place in the space of about two weeks.

■ Whatever this course of treatment may indicate, it is not indifference. Whether it might constitute malpractice is not our concern; *Gamble* teaches that malpractice will not lie under § 1983, and Bass has his malpractice suit on file in the state court system. The only remaining logical possibility for liability is that Dr. Baranowski, in a fiendish course of action reminiscent of *King's Row*, deliberately set out to injure rather than benefit Bass. To believing this there are various impediments. The first is that no adequate motive is shown for such an extraordinary and repellant course of conduct, one which we would be most reluctant to believe occurred without some significant evidence of it. The second is that Bass does not seriously contend for such a thing, rather the contrary.[7] But the third and most significant is that the regimen pursued by Dr. Baranowski in treating Bass is generally along standard lines for treating thermal injuries and not at all a charade.

Even the literature of this category of ailment is not for the faint-hearted. According to testimony and authoritative medical papers in the record, the normal sequel to thermal injury not superficial is swelling of the affected member, followed by the formation of large blisters. The flesh is cool and turns blue, purple or grey. Throbbing pains are experienced for from two to eight weeks. At length, the blisters dry up, the skin blackens, and sloughing occurs. Sometimes the entire outer skin of the member is cast like a sock or glove, revealing a layer of red and healthy, but exquisitely sensitive, new skin which requires months to toughen to normal condition. In less happy cases, the injured member begins to blacken from the tip, and gradually shrivels and mummifies up to a line with healthy flesh. Autoamputation then occurs, with loss of the mummified portions and with retention of a maximum of healthy tissue as compared with the results of surgical intervention. Even more unfortunately, the member may become wet, soft and inflamed, requiring surgical intervention. Even in this latter case, however, with proper treatment the desired autoamputation usually occurs—desired, that is, by comparison with surgical amputation.

Treatment of such injuries involves playing a waiting game, after the initial rewarming of the limb or limbs. This latter is done by means of warm water, if available, preferably a whirlpool bath. Any means to increase circulation, such as heating blankets or vasodilatating drugs, should be employed. Lost fluids should be replaced by intravenous means. In the case of distraught or weakened patients, no pain-relieving agents should be administered except aspirin-type analgesics. Indeed, weighty authority opines that during the entire convalescence—which will be long—only aspirin be used for pain. Antibiotics are not needed, except for specific indications if infectious complications develop. One then waits, on guard against infections or any use of the injured limb—this latter being almost sure to cause further damage. The injured part is left completely alone during convalescence. Dressings are not changed unless they have become very dirty. The urge to amputate is resisted, since, as one of plaintiff's medical authorities notes, "There is no condition possibly requiring amputation in which the surgeon should be more conservative. 'Frozen in January, amputate in July' may be an exaggeration. . . ." Another authority in the record notes that "Most tissue that seems to demand removal will probably remove itself much more effectively than even the best surgeon can do it. . . ." and adds, "many an inexperienced doctor has been argued into needless and tragic amputation of basically sound tissue as a result of the hysterical pleadings of an unreasonable patient with frostbite." So far from being a tardy decision after "leaving Bass to rot" as counsel argues, under the

7. In closing argument below, able counsel for Bass speculated that in Bass' condition Dr. Bar-    anowski "had something that he did not understand what he was dealing with."

medical authority in the record Dr. Baranowski's decision for amputation is more subject to criticism as arguably precipitous. Pathological examination of the amputated members revealed them, however, to be gangrenous throughout.

Measured against this picture of "standard" treatment for deep thermal injury, drawn from the record and resketched above, the treatment given Bass by Dr. Baranowski approximates the classic parameters. Mindful of Bass' pending malpractice case, we express no opinion on proper issues therein. We do declare, however, that on this record there can be no question of any intent by Dr. Baranowski to injure Bass and that the weight of the evidence is clearly against any indifference on his part to Bass' fate—deliberate, callous or otherwise. There is little question that Bass suffered a deep thermal injury. Indeed, the conditions under which he suffered prolonged exposure to the elements were such that several medical witnesses agreed he might have died. The treatment he received does not deviate in any striking manner from the customary. The trial court was entirely justified, despite the tragic event, in finding that Bass suffered no barbarous or shocking neglect of basic medical needs. We conclude, on the record, that if deliberate indifference be a different standard, it has not been shown either. More might be said in support of our above conclusions, but in order to avoid even the appearance of trenching in any degree upon Bass' state court claims we stop here.

Since Bass received treatment which, at a minimum, satisfied constitutional requirements, neither Dr. Baranowski nor his supervisory officials can be held liable in this individual civil rights action. Bass' constitutional rights not having been breached, no one is liable on any theory.

We have carefully examined appellant's other points of error—refusal of the judge to stand recused and dismissal of the pendent malpractice claim—and they are meritless.

AFFIRMED.