**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George N. GARRETT,
Defendant-Appellant.**

No. 77–5221.

United States Court of Appeals,
Fifth Circuit.

Nov. 17, 1978.

Theodore J. Sakowitz, Federal Public Defender, Joseph Mincberg (Court-appointed), Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U.S. Atty., Miami, Fla., Richard S. Stolker, Atty., Dept. of Justice, Washington, D.C., Katherine Winfree, Atty., T. George Gilinsky, Sidney M. Glazer, Dept. of Justice, Washington, D.C., Martin Steinberg, Sp. Atty., Jay Moskowitz, Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

FAY, Circuit Judge:

Defendant was tried before a jury and convicted on a nineteen count indictment charging various violations of the National Firearms Act, 26 U.S.C. § 5801 et seq. and Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. App. § 1201–03. He was sentenced to a total of fifty years imprisonment. In this appeal defendant urges: 1) that the trial court erred by allowing prosecution testimony which tended to impugn defendant's character, 2) that the court improperly instructed the jury with respect to the elements of a 26 U.S.C. § 5861(e) offense (transfer of a firearm in violation of the Firearms Act), 3) that there was insufficient evidence offered to prove an 18 U.S.C. App. § 1202(a) offense (possession of a firearm by a convicted felon), 4) that the court improperly instructed the jury with respect to an 18 U.S.C. App. § 1202(a) offense, 5) that the imposition of consecutive sentences for violations of the National Firearms Act was improper, and 6) that the trial court erred by failing to instruct the jury on defendant's theory of the case. For reasons more fully developed below, we affirm appellant's conviction, but vacate the sentences and remand this action to the district court in order that it may consider the merits of defendant's post-trial sentence-reduction motion.

## FACTS

The evidence against appellant consisted primarily of testimony by Eugene Weiner, a convicted felon who became a confidential informant for the Drug Enforcement Administration (DEA) and the Bureau of Alcohol, Tobacco and Firearms (ATF). Weiner testified under a grant of immunity. His testimony was substantially corroborated by physical evidence, tapes of monitored conversations between Weiner and appellant, and the testimony of several ATF agents.

Viewing the evidence in a light most favorable to the government, *see Glasser v.*

*United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence reveals that in mid-1974, prior to becoming a DEA informant, Weiner was introduced to appellant by Michael Pye. In September of that year, Weiner purchased three silenced .22 caliber Ruger pistols from Pye. During delivery to Weiner of one of the weapons, appellant and Rose Licata (appellant's girlfriend) were present at Pye's home. Licata removed the silenced weapon from her purse and handed it to Weiner. Garrett advised Weiner that any future firearms transactions could be conducted directly between themselves, "without going through Mike Pye."

Thereafter, Weiner and appellant became friends. In October 1975, appellant made silencers for three .22 caliber Rugers belonging to a friend of Weiner. Apparently fearing for his life due to a murder attempt, Weiner fled to California in November 1975. Prior to his departure, Weiner left a .22 caliber rifle that belonged to Weiner's girlfriend and a .22 caliber semi-automatic pistol with appellant who agreed to "silence" the rifle. When Weiner returned from California in January 1976, appellant said that he had cut the stock off and had partially completed the silencer.

Later in January 1976, Weiner was arrested while driving in his car. A police search of that car revealed an automatic pistol, a semi-automatic carbine, a .38 caliber Smith and Wesson revolver, two other guns, and miscellaneous controlled substances. Realizing the error of his ways, in April 1976 Weiner became a confidential informant for DEA.

On August 13, 1976, Weiner was introduced by the DEA to Agent George Hopgood of ATF. Weiner informed Hopgood that Garrett was in the business of manufacturing and selling silencers, and that Garrett had offered to sell him a short-barreled rifle fitted with a silencer for $200. Weiner agreed to attempt to purchase the weapon from appellant.

Accordingly, Weiner called appellant, advised that he had a buyer for the rifle, and urged appellant to complete construction of the silencer. On August 15, 1976, appellant notified Weiner that the silencer was ready, and they made arrangements for delivery on the following day.

*The Firearms Transfer of August 16, 1976*

On August 16, 1976, at approximately 9:45 a. m., Agent Hopgood went to Weiner's residence. Hopgood searched the house and, with Weiner's consent, placed a transmitter in a bedroom closet and an adaptor-recorder on the telephone. Weiner then called appellant and told him that his buyer had just dropped off the money. Hopgood departed at approximately 10:10 a. m., leaving $200 with Weiner.

When appellant arrived with Licata at approximately 10:40 a. m., he was carrying a long object wrapped in newspaper. Appellant carried the object into the rear bedroom and unwrapped the newspaper, revealing a .22 caliber rifle with a silencer attached to the shortened barrel. The silencer was permanently affixed to the barrel of the rifle. The barrel and silencer, however, could be unscrewed from the action.

Appellant and Weiner testfired the weapon into a telephone directory. According to the taped conversations, appellant felt the weapon was "a little bit loud but still a good gun." Weiner gave appellant $200 for his work.[1] Weiner indicated that if his "people" were pleased, additional orders might be forthcoming. Weiner and appellant also discussed "kill kits," consisting of

---

1. The rifle was the weapon Weiner had delivered to appellant in November 1975 for construction of a silencer. The serial number on the rifle had been obliterated, the barrel shortened to a length of less than three inches (overall length of the rifle was 21⅜ inches) and the stock removed. The silencer bore no serial number. Appellant's activity with the short-barreled rifle was the basis of counts 2, 3 and 6; his activity with the silencer was the basis of counts 1, 4 and 5.

a .22 caliber Ruger and silencer mounted in an attache case with a "pull ring" to trigger the weapon without opening the case. Appellant said that if he were going to make more silencers, Weiner or his buyers would have to purchase and supply the weapons to be silenced.

### The Assassination Kit Transfer of September 7, 1976

Thereafter, at Agent Hopgood's direction, Weiner ordered two "kill kits" from appellant. Weiner and Garrett agreed on a price of $600 for each kit: Garrett would take delivery of the weapons (to be supplied by Weiner's buyers), construct the silencers, purchase the attache cases, and mount the weapons and silencers in them. On August 31, 1976, ATF Agent Charles Lowe advised Weiner that ATF could not furnish pistols to be used in manufacturing assassination kits. Weiner then informed appellant that his buyers could not supply the weapons, and alternative methods of securing the firearms were discussed.

Thereafter, appellant informed Weiner that the first kit was completed. On September 7, 1976, ATF Agent Charles Lowe gave Weiner $600 for the purchase of the assassination kit from appellant. Later that day, as before, Agent Hopgood searched Weiner's house and installed two transmitters. Hopgood left at 3:20 p. m. Weiner then called appellant who arrived at about 5:10 p. m. In exchange for the $600, appellant delivered to Weiner an attache case fitted with metal casings, styrofoam, and a .22 caliber Ruger pistol with an attached silencer. After appellant explained to Weiner how the kit worked and how to remove the weapon from the case, they testfired it into a telephone book. Appellant admonished Weiner to wipe off the case before delivery to the buyer. Weiner

then contacted Agent Hopgood, who took possession of the attache case. The serial number on the Ruger had been obliterated, and the silencer bore no number.[2]

### The Assassination Kit Transfer of September 9, 1976

The following day, on September 8, 1976, Weiner called appellant from the ATF office, told him that his "people" were satisfied with the assassination kit, and asked appellant to make another kit as soon as possible. Appellant indicated that construction of the second kit was underway and that it would be ready the next day.

On September 9, 1976, while en route to an appointment in a taxicab, Weiner passed appellant traveling in the opposite direction. Weiner directed the driver to stop the taxicab so that he could speak with appellant. Appellant told Weiner that he would put the second kit in the trunk of his Ford Thunderbird (which appellant previously had parked in front of Weiner's house), that he would give Weiner the key, and that he would get the money later. Weiner thereupon instructed the driver to return to his residence. When he arrived, appellant was already there and the trunk of the Thunderbird was open. Appellant closed the trunk, gave Weiner the key, and left. Without opening the trunk, Weiner proceeded in the taxicab to his appointment.

When he returned home, Weiner telephoned Agent Lowe, who instructed Agent Hopgood to meet Weiner at his residence. When Hopgood arrived, he opened the trunk and found an attache case in a paper bag. Hopgood and Weiner then went to the ATF office, where Hopgood opened the attache case; substantially the same as the first kit, it contained a .22 caliber Ruger pistol with a silencer attached.[3] Agent

---

**2.** This transaction formed the bases of counts 7 through 9, charging unlawful possession and transfer of the silencer.

**3.** As with the first assassination kit, the serial number on the pistol was obliterated and the silencer had no number. This transaction

Lowe gave Weiner $645 to give appellant in payment for the kit. Weiner telephoned appellant, and they made arrangements for the latter to pick up the money at Weiner's house later that night.

### The Seizure of the Remaining Firearms

On September 30, 1976, agents of the ATF executed a warrant to search the premises of Bay 34, 1951 Northwest 141st Street, Opa Locka, Florida, which was a mini-warehouse subleased by appellant. Among other things, the agents found a fully loaded short-barreled Remington shotgun[4] and a "pipe-type" silencer bearing no serial number.[5]

The next day, on October 1, 1976, ATF agents seized the Ford Thunderbird in which appellant had previously delivered the second assassination kit. In the trunk

they found a silencer. This silencer had no serial number and was designed for use with a .22 caliber weapon.[6]

Appellant was arrested that same day. On that date, he had in his possession an Ithaca 12 gauge pump-shotgun. Appellant was not licensed to engage in the business of manufacturing or dealing in firearms, no firearms were lawfully registered to him, and he had neither applied to transfer any firearms nor paid any required transfer taxes.

### 1. Character Evidence

■ Garrett complains that the trial court denied him a fair trial by admitting testimony of misconduct not charged against appellant and not evidenced by conviction.[7] We note that appellant failed to object during trial to any of the statements

---

formed the bases of counts 10 through 12, charging unlawful possession and transfer of the silencer.

4. Possession of this weapon, in violation of 26 U.S.C. § 5861(d), was alleged in count 13; count 19 alleged the unlawful receipt and possession of this weapon, another shotgun, and three semi-automatic pistols in violation of 18 U.S.C. App. § 1202.

5. Counts 14 and 15 charged possession of this firearm, in violation of 26 U.S.C. § 5861(d) and (i).

6. Possession of this firearm, in violation of 26 U.S.C. § 5861(d) and (i), was alleged in counts 16 and 17.

7. Specifically, Garrett now objects to the following colloquies between Weiner and Government counsel:

Q. What was that discussion, please?
A. That in the future, if I would want any more, I could deal directly through him without going through Mike Pye.
Q. Alright. After that particular event, did you continue to have contact or did you have any further contact with George Garrett?
A. Yes, I did. We became friends and *we were involved in dealing drugs*, and sometime passed, and then there were other weapons transactions. (Emphasis added)
    \*   \*   \*   \*   \*   \*
Q. Now, during your conversations at about this time with George Garrett, did he ever tell

you anything about the place where he was making the kit and the silencer?
A. In a general way. He never told me where the place was. He just told me a couple of particulars about it. *He told me that he wasn't paying electricity, that he had rigged the electric meter* and that the rent was $135 a month. (Emphasis added)
    \*   \*   \*   \*   \*   \*
Q. Alright, now, would you tell the jury, please, what conversation, as you recall, that you had with George Garrett on that occasion.
A. We spoke about all kinds of things; about the gun business, *about the robbery*, about the replacement of the guns again that he was being hassled by Charlie and that he had to replace those guns. (Emphasis added)
    \*   \*   \*   \*   \*   \*
Q. —why didn't you look inside the trunk of the T-bird between the time that you arrived home until the time that the agents came to your house?
Mr. Doddo: Objection, Your Honor. I think that's leading.
The Court: Overruled. You may answer the question.
The Witness: Why didn't I look in it?
By Mr. Pope: Q. Yes.
A. By that point, I was beginning to be quite leary about what I was doing, and—on a couple of occasions where George Garrett had told me that *he fooled around with explosives* and I was a little bit nervous about going near the car. (Emphasis added)
    \*   \*   \*   \*   \*   \*

challenged in his brief. This court has stated: "Where the trial court has accorded all the relief requested or has had no request for relief, a reversal can only be based on appropriate application of the plain error rule." *United States v. Barcenas,* 498 F.2d 1110, 1113 (5th Cir.), *cert. denied,* 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974). Each case must be judged on its own particular facts in making a plain error determination. *United States v. Barcenas,* 498 F.2d 1110, 1113 (5th Cir.), *cert. denied,* 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974); *United States v. Beasley,* 519 F.2d 233, 238 (5th Cir.), *rehearing en banc denied,* 522 F.2d 1280 (1975), *vacated and remanded on other grounds,* 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976); *Benham v. United States,* 215 F.2d 472, 474 (5th Cir. 1954). Weiner testified at great length. The statements complained of were unsolicited responses to proper questions. In view of the overwhelming evidence of guilt and the plethora of testimony regarding appellant's manufacture of "kill kits", we do not find that these statements were unduly prejudicial. We are unpersuaded that any of these statements so affected Garrett's substantial rights as to warrant a new trial. Fed.R.Crim.P. 52(b).[8]

### 2. The § 5861(e) Jury Charge

Counts III, IV, VIII and XI of the indictment charged violations of the Firearms Act, alleging transfer of firearms without having paid the transfer tax (as required by 26 U.S.C. § 5812) and without registering the transfers (as required by 26 U.S.C. § 5812).[9] Appellant asserts that the jury instructions with respect to these counts were in error.[10] Particularly, the appellant argues that the court's use of the disjunctive "necessarily excluded at least

---

Q. Did George say anything to you concerning why he wanted the Rugers, other than what you have already testified to?
A. The second one—the second purchase, the one I made at Seminole Gun Shop, said he had a job to do, and he needed one right away. *He also asked me if I could get him some amphetamines,* because he'd have to stay awake for a few days. (Emphasis added)

8. At oral argument, appellant argued one point which was the subject of an objection at trial and not raised in appellant's brief to this court. In particular, appellant objected to references to a kill kit used in a California murder. The district court judge, correctly ruled that appellant's trial counsel opened the door to that testimony by asking Weiner on cross examination:

Q. Now, you were in California November of '75, in April of '76, you began cooperating with the government, DEA, in telling them about the drug dealers, in June or July some murder was committed out in California, which Mr. Budman called you about, and in August you decided to turn in George Garrett; is that correct?
A. That's correct.

9. Count III concerned the August 16, 1976 transfer of a short-barrelled .22 caliber rifle, Count IV concerned the August 16, 1976 transfer of a silencer, Count VIII concerned the September 9, 1976 transfer of a silencer attached to a Ruger pistol, and Count XI concerned a similar transfer occurring on September 9, 1976.

10. After reading verbatim the requirements of 26 U.S.C. § 5812, and explaining that 26 U.S.C. § 5811 imposes a tax on the transfer of firearms to be paid by the transferor, the court charged the jury as follows:

The Government must prove the following essential elements in order to establish the offense of transferring a firearm without paying the transfer tax, *and* meeting the statutory requirements. There are *five* essential elements:
1. That the defendant knowingly transferred a firearm;
2. That the defendant did not pay the transfer tax; *or*
3. That the defendant did not make application for the transfer and registration of the firearm to the transferee; *or*
4. That the defendant did not otherwise comply with the transfer requirements of this Act; *and*
5. That the firearm was a firearm with the meaning of the Act.
The Government has the burden of establishing *each* of these essential elements beyond a reasonable doubt (emphasis added).

No objection to this instruction was made by defendant at trial. Therefore, our inquiry is again governed by the standard of plain error. *United States v. Brown,* 547 F.2d 1264, 1266 (5th Cir. 1977).

two and possibly three of the five essential elements which the jury was required to have found before it could return a guilty verdict against the Appellant." We cannot agree.

The proper procedure for the lawful transfer of a firearm is set forth at 26 U.S.C. §§ 5811–5812. Section 5811 requires payment of a $200 tax on the transfer of a firearm.[11] Section 5812 provides that a firearm may not be transferred unless the tax imposed under Section 5811 is paid and unless an application is filed with the Secretary of the Treasury setting forth a number of items of information enumerated in the section.[12] 26 U.S.C. § 5861(e) makes it unlawful for any person "to transfer a firearm in violation of the provisions of this chapter." Accordingly, if the transfer tax is not paid *or* the application is not filed, *or* the application fails to include any one of the specifically delineated items of information required by section 5812, the transfer is unlawful as provided by 26 U.S.C. § 5861(e). *Cf. United States v. Goodson,* 439 F.2d 1056, 1058 (5th Cir. 1971) (possession of firearm not per se unlawful; only when possession is conjoined with failure of possessor or

another to comply with one or more of the enumerated regulatory sections does a violation of section 5861(b) predecessor occur). Of course, proof of a knowing transfer (point 1 of trial court's charge) of a firearm (point 5 of trial court's charge) is essential, *see United States v. Freed,* 401 U.S. 601, 607–10, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1970); *United States v. Vasquez,* 476 F.2d 730 (5th Cir.) cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973), and the instructions positively stated the requirement of those elements, without use of the disjunctive. However, proof of each of points 2 through 4 (as charged by the court)[13] is not essential. It is sufficient to establish either that appellant failed to pay a transfer tax (point 2 of trial court's charge), or that he did not make an application for transfer (point 3 of trial court's charge), or that he did not otherwise comply with the transfer requirements (point 4 of trial court's charge) (e. g., by omitting a required item of information on an application). Consequently, the court's use of the disjunctive with regard to those elements was entirely proper. The trial court's initial statement that proof of all five elements is necessary, and its repeat of that statement after explaining the five

---

**11.** 26 U.S.C. § 5811 provides:

§ 5811. Transfer tax
(a) Rate.—There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845(e) shall be at the rate of $5 for each such firearm transferred.
(b) By whom paid.—The tax imposed by subsection (a) of this section shall be paid by the transferor.
(c) Payment.—The tax imposed by subsection (a) of this section shall be payable by the appropriate stamps prescribed for payment by the Secretary.

**12.** 26 U.S.C. § 5812 provides:

§ 5812. Transfers
(a) Application.—A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp

affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.
(b) Transfer of possession.—The transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

**13.** *See* note 10, *supra.*

elements was incorrect. However, as the statement placed a greater burden on the government, it could only have worked to defendant's advantage. Accordingly, we find no prejudice of which appellant may complain.

3. 18 U.S.C. App. § 1202(a)

Appellant was also convicted of possessing a firearm in violation of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. App. §§ 1201–1203. The statute provides, in pertinent part:

Any person who—

(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony

. . .

\* \* \* \* \* \*

and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. App. § 1202(a).

Appellant urges that the government failed to establish an adequate nexus between appellant's "possession" and interstate commerce. In addition, appellant claims that the government's failure to establish that appellant received the subject firearms after the effective date of the Omnibus Crime Control and Safe Streets Act constitutes insufficient evidence, as a matter of law, to sustain a § 1202(a) violation.

■ The statutory phrase "in commerce or affecting commerce" in § 1202(a) applies to "possesses" and "receives" as well as to "transports." *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). In *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), the Supreme Court addressed the issue of the quantum of evidence necessary to establish a nexus with interstate commerce, sufficient to sustain a § 1202(a) "possession" conviction. Rejecting petitioner's contention that the government must prove that petitioner had carried the firearm in an interstate facility, the Court noted: ". . . we see no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Id.* at 575, 97 S.Ct. at 1969.

In the instant case, appellant stipulated that each of the firearms described in Count XIX was manufactured outside the State of Florida. He further stipulated that in 1959 he had been convicted of a felony within the meaning of § 1202(a)(1). Moreover, on cross-examination, Garrett admitted possession of the guns described in Count XIX of the Indictment. As the evidence showed that each of the five firearms was manufactured outside the State of Florida, and each was possessed in 1976 by appellant, a convicted felon, within the State of Florida, the requirement that possession be "in or affecting commerce" has been satisfied.[14]

■ Appellant's assertion that the government must prove that he came into possession of the firearms after the enactment of § 1202(a) must also fail. Count XIX charged defendant with receipt *and* possession of the firearms in violation of 18 U.S.C. § 1202.[15] This court has stated:

---

14. Our resolution of this issue precludes our adopting appellant's argument concerning the need for a jury instruction explaining the need for some additional action on defendant's part connecting his possession of the firearms with interstate commerce.

15. The full text of Count XIX reads as follows:

Count XIX

From on or about August 20, 1976, up to and including on or about October 1, 1976, in the Southern District of Florida the defendant, George N. Garrett, having been convicted of felony did knowingly and willfully receive and possess in commerce and affecting commerce the following firearms:

A. One short-barreled Remington shotgun, Model 1100, 12 gauge, semi-automatic, serial number L–167120–V, barrel length 12⅞".

B. One Ruger semi-automatic pistol, 22 caliber, serial number obliterated.

Where a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means of commission is sufficient.

*Fields v. United States*, 408 F.2d 885, 887 (5th Cir. 1969). *See Cunningham v. United States*, 356 F.2d 454 (5th Cir. 1966). Accordingly, proof of Garrett's possession obviated the need for proof of Garrett's receipt. Proof of either receipt or possession would have been sufficient to sustain a § 1202(a) offense.[16]

#### 4. Jury Charge

Appellant urges that the district court erred in refusing to give a number of requested jury instructions. At trial, defendant denied manufacturing any of the silencers, denied removing the serial numbers from any silencers, and stated that the silencers were given to him by Weiner.

■ The first instruction which appellant urges was improperly withheld concerned Count XVIII and appellant's assertions that Weiner had manufactured the silencers.[17] As the proposed charge was adequately covered by the court, it was not error, plain or otherwise, to fail to give the requested instruction. *United States v. Alonzo*, 571 F.2d 1384 (5th Cir. 1978); *United States v.*

*Zepeda-Santana*, 569 F.2d 1386 (5th Cir. 1978); *United States v. Peterson*, 488 F.2d 645, 648–49 (5th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

■ Appellant also requested the district court to instruct the jury that it must acquit on the counts of possession of firearms with obliterated or absent serial numbers (Counts 5, 6, 9, 12 and 17) if it found that Eugene Weiner supplied those firearms to appellant in that condition, and that it must acquit on the counts of possession without registration and transfer without paying the transfer tax (Counts 1, 2, 3, 4, 7, 8, 10, 11, 13, 14 and 16) and receipt and possession of firearms as a convicted felon (Count 19) if it found that Weiner supplied those firearms. In essence, those instructions embodied the specialized defense recognized by this Court in *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971), *cert. denied*, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411 (1973). In *Bueno*, the Court found entrapment as a matter of law where the government provided the contraband to the defendant for sale to a government agent. However, as this Court recently recognized in *United States v. Benavidez*, 558 F.2d 308, 309 (5th Cir. 1977), *Bueno* was "effectively reversed" by *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). *Hampton* established that " 'it is only when the government's deception actu-

---

C. One Ruger semi-automatic pistol, 22 caliber, serial number obliterated.
D. One Colt semi-automatic pistol, 45 caliber, serial number 70–SC–39297.
E. One Ithica pump shotgun, 12 gauge, serial number 371–40–5099.
All in violation of Section 1202, Title 18, United States Code, Appendix.

16. In light of our resolution of this issue, appellant's assertion that failure to instruct the jury that defendant must have received the weapons after enactment of the Crime Control Act must fail.

17. The defendant's proposed instruction # 1 reads as follows:
The defendant has denied manufacturing the alleged firearms. Therefore, if you find be-

yond a reasonable doubt that the items alleged to be silencers were in fact silencers and you have a reasonable doubt as to whether Eugene Wiener made the alleged silencers then you must find the defendant not guilty as to Count 18.
The Court charged the jury as follows:
You are further instructed that the defendant has denied manufacturing the alleged firearms. Therefore, if you find beyond a reasonable doubt that the items alleged to be silencers were in fact silencers and you have a reasonable doubt as to whether the defendant or someone else made the alleged silencers, then you must find the defendant not guilty as to Count XVIII.

ally implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.'" *Id.* at 489, 96 S.Ct. at 1649, *quoting United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The Supreme Court upheld the conviction despite the fact that a government informant had supplied the defendant with the contraband which he was later convicted of selling to government agents. Thus, in the instant case, the court properly refused the requested instructions. *United States v. Benavidez*, 558 F.2d 308, 309 (5th Cir. 1977).

### 5. Consecutive Sentencing

The final point raised by appellant concerns the legality of the consecutive sentences imposed by the trial court. In particular, appellant urges that in enacting the National Firearms Act, Congress did not intend to authorize cumulative sentences for single transactions which violate more than one section of the Act.[18]

■ After sentencing, and one day before filing notice of appeal, defendant moved to correct the "illegal" sentence. After receiving the government's response to that motion, Judge King correctly ruled that the district court lacked jurisdiction to vacate an illegal sentence once a notice of appeal has been filed. *United States v. Mack*, 151 U.S.App.D.C. 162, 466 F.2d 333, 340, *cert. denied*, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972). *See Welsh v. United States*, 404 F.2d 333 (5th Cir. 1968).

In light of the issue presented, we believe that the district court should handle this matter in the first instance. Accordingly, on this point we remand this case to the district court for a ruling on the merits of defendant's motion. In disposing of defendant's motion, it would prove helpful if the district judge would make specific findings concerning the sentences being imposed. For example, it would be helpful to this Court, if subsequent review is in order, to know whether the district court has treated the gun and silencer of Counts I—VI as two separate firearms, and further, the effect of the "same transaction" and "merger" doctrines on the sentences imposed.[19]

Therefore, in accordance with this opinion, appellant's conviction is affirmed. The matter is remanded to the district court for consideration of defendant's post-trial motion. We retain jurisdiction to review this area subsequent to the ruling by the trial court.

**18.** For an excellent discussion of the legislative history of the oft-amended National Firearms Act, *see United States v. Clements*, 471 F.2d 1253, 1255–58 (9th Cir. 1972) (Hufstedler, J.).

**19.** The following might assist the trial court in making this determination. *United States v. McDaniel*, 550 F.2d 214, 219 (5th Cir. 1977); *United States v. Kalama*, 549 F.2d 594, 597 (9th Cir. 1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977); *Rollins v. United States*, 543 F.2d 574, 575 (5th Cir. 1976); *United States v. Ponder*, 522 F.2d 941 (4th Cir. 1975); *United States v. Ackerson*, 502 F.2d 300 (8th Cir. 1974), *vacated on other grounds*, 419 U.S. 1099, 95 S.Ct. 769, 42 L.Ed.2d 796; *United States v. Tankersley*, 492 F.2d 962 (7th Cir. 1974); *United States v. Clements*, 471 F.2d 1253 (9th Cir. 1972). *See United States v. Kiliyan*, 504 F.2d 1153 (8th Cir. 1974), *cert. denied*, 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 428 (1975). *See generally, Fifth Circuit Survey*, 9 Tex.Tech.L.Rev. 795, 1069–73.