Lonnie Elbert **FIELDER** et al.,
Plaintiffs-Appellees,

v.

August H. **BOSSHARD** et al.,
Defendants-Appellants.

No. 76–4376.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1979.

Rehearing Denied March 22, 1979.

Ed C. Small, Jr., C. C. Small, Jr., Austin, Tex., for defendants-appellants.

Waggoner Carr, Robert L. Crider, Austin, Tex., for plaintiffs-appellees.

Before INGRAHAM, GEE and FAY, Circuit Judges.

FAY, Circuit Judge:

Lonnie and Edna Fielder, father and mother of decedent Jimmie Fielder, brought this § 1983[1] action as next of kin against Sheriff August Bosshard, Chief Deputy Daniel Walker, Deputy William Chandler, and Jailer Robert Champion [hereinafter "the appellants"]. The basis of the suit is the appellants' alleged violation of Jimmie Fielder's constitutional right to be free from cruel and unusual punishment while he was incarcerated in the Williamson County, Texas jail. A jury returned a verdict in favor of the plaintiffs against all of the defendants. Actual and punitive damages of $40,000 and $20,000 respectively were assessed against Sheriff Bosshard, and against Jailer Champion in the amounts of $10,000 and $9,000 respectively. Actual damages of $20,000 were charged against Deputy Walker. No damages were assessed against Deputy Chandler. The trial court denied the appellants' motions for summary judgment, directed verdict, judgment notwithstanding the verdict and new trial.

The appellants raise four points on appeal: 1) the evidence does not support the jury's finding of cruel and unusual punishment; 2) the trial court erred in failing to instruct the jury with respect to the appellants' qualified immunity; 3) the plaintiffs failed to prove causation; and 4) the evidence does not support the jury's award of compensatory and punitive damages. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

According to *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *remanded,* 554 F.2d 653 (5th Cir. 1977), and this Circuit's interpretation of it, to prevail in a § 1983 suit based on cruel and unusual punishment a prisoner must prove that "the conduct in question runs counter to evolving standards of decency or involves the unnecessary and wanton infliction of pain." *Bass v. Sullivan,* 550 F.2d 229, 230 (5th Cir. 1977) (interpreting *Gamble*). At a minimum, the plaintiff must show that prison officials acted with a conscious or callous indifference to his serious medical needs. *Id.* Mere negligence, neglect or medical malpractice is insufficient.

Viewing the facts in the manner most favorable to the appellee,[2] we hold that the plaintiffs have proved their case. On July 2, 1976, Jimmie Fielder was arrested by appellants Walker and Chandler for failure to make child support payments. They were told that Fielder was sick and under medication. He was taken to the Williamson County Jail. Robert Champion, the jailer, was informed by Fielder's mother that Fielder was sick, that he had a virus and high blood pressure, and that he hadn't eaten. When told that Fielder hadn't eaten, Champion responded: "We feed them black coffee and biscuits." When Mrs. Fielder brought buttermilk and soda to the jail, Champion threw it in the cell "like he was feeding a bunch of hogs." Finally, Mrs. Fielder pointed out that her son needed attention and that it was very hot in the jail. Champion replied: "If you don't like the way I run this jail, you go to higher authorities." Although these comments and others to follow do not in themselves establish cruel and unusual punishment, they reflect the appellants' attitudes. When considered in conjunction with the

---

1. 42 U.S.C. § 1983.

2. *Boeing v. Shipman,* 411 F.2d 375 (5th Cir. 1969).

events leading up to Jimmie Fielder's death, these statements tend to show that the appellants were not merely unmindful or negligent prison officials.

At noon on July 4, 1976, Fielder's behavior became bizarre. Fellow prisoners testified that he seemed physically sick and that he began to see things, such as the Lone Ranger. By sundown he was seeing Indians. He was physically shaking. He climbed the bars, saying that there was barbed wire on them and that he was cutting his hands. Fielder's condition worsened as the day progressed. At around dinner time, the prisoners called Jailer Champion. At the time Champion arrived, Fielder was jumping from the top bunk to the lower one on the other side. Fielder asked Champion for his pills. Champion replied that Fielder had already taken them. Fielder then requested a doctor. Champion refused. He said that Fielder was "just joking," that he wasn't sick. An inmate testified that Champion responded in this way each time he was called that night.

At 9:00 P.M. on July 4, Champion called the sheriff's office to inform them of Fielder's condition. Deputies Chandler and Walker went to the jail, and the three men escorted Fielder to a cell on the second floor. Fielder was irrational, afraid, mumbling incoherently, and waving his arms. The jailer and the two deputies maintained that he was faking. The inmates testified that they forcibly removed Fielder from the cell and that it sounded like they were hitting him. Deputy Walker later stated in his report to Sheriff Bosshard that Fielder was just "putting on."

At 10:00 P.M. Champion looked in on Fielder through the glass panel in the cell door. He later checked two more times in this way, but Fielder showed no improvement. Opal Birch, a neighbor to the jail, testified that at approximately 10:00 P.M. she heard a voice from the jail say "Help me. I need a doctor." An inmate testified that he heard moaning coming from the upstairs cells at 1:00 A.M. on July 5. Although he stated that he lives in the jail and he can generally hear the prisoners call him, Champion denied hearing any of this.

At 12:30 A.M. on July 5 Champion informed Sheriff Bosshard that Fielder was suffering from delirium tremens and that he had been seeing Indians, mumbling and pacing the floor when Champion checked on him at 10:30 P.M. Bosshard didn't ask how long Fielder had been acting this way or whether they had called a doctor. Bosshard asked Deputy Walker to check on Fielder, but he did not inquire whether Walker had actually done so. Shortly after midnight, on July 5, Deputy Walker left with the sheriff a report describing Fielder's strange behavior of a few hours before. Bosshard did nothing.

At 7:00 A.M. on July 5, Champion looked into Fielder's cell. Fielder was lying quiet on the bare floor. Without first checking on Fielder, Champion reported to Bosshard, who advised him to do so. Jimmie Fielder was dead.

There was sufficient evidence in the record to support the jury's decision that Fielder was a victim of cruel and unusual punishment. Each of these four appellants knew of the extremity of Fielder's illness. Their defense was based in part upon the contention that Fielder was a known heavy drinker and that they thought he was exhibiting the symptoms of delirium tremens. However, both the severity of the apparent illness and the appellants' off-hand, callous comments with respect to Fielder's welfare belie the theory that they merely misdiagnosed a prisoner's sickness. There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help.

The jury was carefully and correctly charged that mere negligence was insufficient to sustain a finding for the plaintiffs. The jury obviously believed that the appellants had crossed the line between misfeasance and conscious cruelty. In a case such as this, where the attitudes and states of mind of the defendants weigh so heavily, we are quite reluctant to read between the

lines of the record. We commit our trust to the jurors who saw and heard the witnesses.

## II. JURY INSTRUCTIONS

At trial, appellants' counsel requested the court to charge the jury that "jail officials are by necessity vested with a wide degree of discretion in determining the need, nature and character of medical treatment . . . that any failure to provide necessary medical treatment must be more than negligence or poor medical judgment to constitute cruel and unusual punishment; and that if no human care or foresight on their part would guard against such injury, then any such failure did not constitute cruel and unusual punishment." Appellants' Brief at 17–18. The requested charge was intended to present to the jury the appellants' qualified immunity defense.[3] Although this instruction was refused, the court charged the jury with respect to cruel and unusual punishment as follows: "The medical care provided to a prisoner, or lack thereof, is cruel and unusual punishment when there is a conscious purpose to inflict suffering, or where there are rampant deficiencies due to a callous indifference to a prisoner's need for medical care, subjecting him to significant deprivations of medical care."[4] Trial Transcript at 305–06. Thus, the question, as we view it, is whether the court's charge as to the plaintiffs' case in chief also adequately covered the appellants' immunity defense.

■ It is clear that appellants were entitled to raise the defense of qualified immunity. Where prison officials were charged with false imprisonment, we held that it was error for the trial court not to instruct the jury that the officials were immune if they acted reasonably and in good faith. *Bryan v. Jones*, 530 F.2d 1210 (5th Cir. 1976) (en banc). Likewise, in a § 1983 action based on violations of due process and unlawful search and seizure, we approved the trial court's instruction that the jury find for the defendant police officers and city officials if it found that they acted "in good faith with a reasonable belief in the validity of their conduct . . ." *Reimer v. Short*, 578 F.2d 621 (5th Cir. 1978). It may be true that a prisoner can establish a prima facie case of false imprisonment without negating the existence of a good faith/reasonableness immunity, since "intent to imprison *without legal authority* need not be proved as an element of the prima facie case." 530 F.2d at 1213 (emphasis in original). Neither is the cause of action based on violations of due process and unlawful search inconsistent with the qualified immunity. An official may violate due process and fourth amendment rights without necessarily acting in bad faith. Accordingly, in these cases it was proper to charge the jury separately with respect to the distinct elements of both the case in chief and the defense.

■ In the instant case, however, we see only a linguistic difference between the standards for the prima facie case based on cruel and unusual punishment and the immunity defense. In order to establish a prima facie § 1983 case of cruel and unusual punishment, a plaintiff must prove that the prison authorities acted with deliberate or callous indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *remanded*, 554 F.2d 653 (5th Cir. 1977); *Bass v. Sullivan*, 550 F.2d 229, 230 (5th Cir. 1977). In order to negate the existence of the official's immunity, the plaintiff must prove either that the official violated his clearly established constitutional rights or that the official acted "with 'malicious intention' to

---

3. According to the appellants, the requested charge was also meant to inform the jury of the necessity of proximate cause. This issue was properly presented to the jury by the court's own proximate cause instruction. We find no error in refusing appellants' version. *See, e. g., United States v. Garrett*, 583 F.2d 1381 (5th Cir. 1978).

4. This charge was drawn substantially from *Newman v. Alabama*, 503 F.2d 1320 n. 14 (5th Cir. 1974). We have noted in *Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977) that *Newman's* callous indifference standard is in essential agreement with the Supreme Court's latest pronouncement in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

deprive the plaintiff of a constitutional right or to cause him 'other injury.'" *Procunier v. Navarette*, 434 U.S. 555, 566, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), *quoting Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Malicious intent, the second part of the immunity test, includes acts which are "substantially certain" to result in the consequences of which the plaintiff is complaining. *Bogard v. Cook*, 586 F.2d 399 at 412, No. 76–2890 (5th Cir. Dec. 15, 1978). We can divine no real difference between acting with "deliberate" or "callous" indifference and committing acts which are "substantially certain" to harm a prisoner. If the plaintiff establishes the requisite "indifference" and thus establishes liability, then he would also have established the official's "malicious intent" as defined in *Wood*, thus negating with the same proof the existence of the qualified immunity. In the area of cruel and unusual punishment, therefore, there is no invariable and absolute necessity for separate charges with respect to liability and immunity. And though this would have been the better practice in the case at bar, we do not believe that the procedure followed harmed defendants' substantial rights in any manner.[5]

■ When the jury was instructed that in order to find the appellants liable for cruel and unusual punishment it must find a "conscious purpose to inflict suffering" or "rampant deficiencies" due to a "callous indifference" to a prisoner's medical needs, it was adequately apprised of the threshold conduct necessary to negate the appellants' qualified immunity. It can hardly be argued that the Court's charge failed to inform the jury that the plaintiff could not prevail if the appellants were merely negligent. Likewise, the level of conduct necessary to trigger liability under this instruction respected and protected the degree of discretion which inheres in prison officials. We therefore reject the argument that the charge was insufficient.

## III. PROXIMATE CAUSE

■ Appellants argue as a matter of law that there was no causal relationship between their acts or omissions and Jimmie Fielder's death.[6] Although both parties were apparently prepared to present expert medical testimony regarding the foreseeability and cause of Jimmie Fielder's death, neither party adduced such evidence at trial.[7] The jury was left to decide the issue from the circumstances surrounding this incident. The evidence revealed in some detail the appellants' actions and the symptoms which Fielder was exhibiting. Having set the jury adrift to interpret the facts without the assistance of medical testimony, the appellants can hardly be heard to complain that the jury landed on the wrong shore. It cannot be said that reasonable men would not chart such a course based upon the evidence presented.

## IV. DAMAGES

■ Finally, appellants maintain that the damages were unsupported by the evidence. The jury awarded the plaintiffs a total of $70,000 in compensatory damages. Appellants challenge the reasonableness of this amount on the basis that less than 20% of Fielder's liver was healthy and that he therefore was incapable of living long enough (eight years) to earn that much. The argument is meritless. First, appellants presented no expert medical evidence that he would not live that long. Certainly

---

5. In *Bogard*, we recognized that *Gamble* is not inconsistent with *Navarette*. No. 76–2890, 586 F.2d at 412 n. 7.

6. Appellants also raise as error the denial of a motion for summary judgment on this issue. The motion was premised on the fact that Dr. de Chenar, purportedly *the only* medical authority competent to testify, since he was the doctor who performed the autopsy, opined that the death was entirely unforeseeable. The able

trial judge denied this motion and we agree. Summary judgment would not have been proper based upon the state of the record.

7. The autopsy report was received as an attachment to plaintiffs' exhibit 2. Contrary to appellant's argument, there is nothing in the autopsy report or the record to show that Jimmie Fielder would not have been helped by medical attention and care.

the loss, if any, in life expectancy occasioned by impairment in function in a portion—even a large portion—of one's liver is not a matter of common knowledge, let alone judicial notice. Second, the jury instruction correctly did not limit the damages to compensation for lost wages. Plaintiffs presented evidence showing the personal loss to Fielder's father, mother, and children. We cannot say $70,000 is too high.

Appellants object to the punitive damages on the ground that the differences in their behaviors did not warrant the differences in the damages. We do not agree. In order to find cruel and unusual punishment, the jury must have found egregious conduct capable of supporting an award of punitive damages. Furthermore, one can find rational distinctions which would support the disparate punitive awards against the appellants. By his own admission, August Bosshard, as sheriff, was charged with the ultimate responsibility for the care of prisoners. However, he was not so bureaucratically removed that he was unaware of what was transpiring at the jail. Indeed, in this case he knew exactly what was happening. Jailer Champion, the only other defendant against whom punitive damages were assessed, was not only directly responsible for the welfare of the prisoners, he was also the subject of most of the adverse testimony against the appellants. Accordingly, we affirm the award of punitive damages against both appellants.

AFFIRMED.