# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00853-COA

JOHN DOE                                                          APPELLANT

v.

JANE DOE                                                           APPELLEE

DATE OF JUDGMENT:             07/06/2020
TRIAL JUDGE:                  HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:    HARRISON COUNTY CHANCERY COURT,
                              FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:      WILLIAM ALEX JOHNY II
                              MICHELLE LUBER ELLIOTT
ATTORNEY FOR APPELLEE:        GAIL D. NICHOLSON
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART - 11/09/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., McDONALD AND EMFINGER, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     John Doe[1] appeals the divorce decree entered by the Harrison County Chancery Court on July 6, 2020, that dissolved the marriage between John and his wife Jane, determined custody and visitation of their children, divided their property, and imposed sanctions on John for discovery abuses.[2] John raises seven issues on appeal, challenging several of the

---

[1] We use fictitious names instead of the actual names of the parties. *See* M.R.A.P. 48A(e).

[2] The chancery court modified its original findings in response to John's motion for reconsideration.

chancery court's factual findings, its distribution of the couple's marital estate, and the sanctions imposed upon him. After reviewing the extensive record, arguments of counsel, and relevant precedent, we affirm the judgment of the chancery court in part, reverse it in part, and remand for further proceedings.

**Facts**

¶2. In 2003, John, who worked at Prudential Financials, met Jane, who was an entertainment manager for a casino and a part-time bartender. They were members of a band in which he played bass, and she sang. They married on June 14, 2005, in Harrison County, Mississippi, where they lived until their final separation. They had two sons, one born in 2005 and the other born in 2008.

¶3. At the time of the divorce, John, who has an MBA degree from Tulane University, was working as a civilian programmer for the National Guard. He had been with the military since 2004. Jane had several other jobs but obtained her real estate license in 2006. Since then, her income from real estate sales was considerably more than John's income. During their marriage, John and Jane lived a comfortable life, although they said they were stressed financially and even discussed divorce at times. John's $3,687.58 per month earnings (after taxes, medical insurance, and his mandatory PERS retirement contribution) were directly deposited into a joint account to pay family bills. Jane maintained a separate business account into which she deposited her monthly gross earnings, which averaged $11,363 as of June 2018. She maintained another account to which she transferred $2,000 per month for her estimated taxes. She or John made transfers from the business account to the family

2

account as needed to cover the family's monthly bills.

¶4.    When they purchased their home, John's parents gifted them $45,000 for the down payment, and Jane's mother contributed $40,000 toward the home's remodel. At the time of the final judgement of divorce, John agreed with Jane's valuation of the home at $220,000, which the chancery court accepted.

¶5.    After an incident on Mother's Day in 2018, John left but returned home a few days later, as he said, "for the sake of his boys." He and Jane resumed family life, including sexual relations, for a brief period of time thereafter. On May 26, 2018, Jane found a picture of a woman named Stacey[3] on John's phone. Stacey and John had a sexual relationship prior to John and Jane's marriage. Earlier in 2018, John and Stacey had "friended" each other on Facebook, and on at least one occasion, John met Stacey briefly in the parking lot of a Home Depot. Jane confronted John about Stacey's picture in his phone and accused him of having an affair. John denied this and left for a week, but then he returned to the home. Jane said she locked John out of the bedroom, and he slept in another room as he had frequently done since February.

¶6.    On June 4, 2018, Jane set up cameras in the bedroom and living room of the house to secretly monitor and record John's actions. Then she took the boys on an out-of-town trip during which Jane watched and recorded John's private activities. John did not know about these cameras or that he was being recorded. In the divorce trial that eventually ensued, the chancery court judge would not admit the recordings as evidence, but there was testimony

---

[3] The last names of lay witnesses are not used to further protect the privacy of the parties.

of what was captured on them.

¶7. On June 14, 2018, during Jane's annual physical, Dr. John Mallett diagnosed her with condyloma (genital warts caused by the HPV virus)[4] and with genital herpes (caused by the HSV2 herpes virus).[5] In an affidavit, Dr. Mallett indicated that Jane will forever carry the HSV2 virus. Jane did not tell John about her condition until after he moved out on June 20, 2018. According to John, in the interim Jane attempted to have sex with him. Jane denied this.

¶8. John lived in the home until June 20, 2018, when another incident occurred at their home during his son's birthday party. Again, John and Jane had an altercation that resulted in Jane's leaving with her sons and the other children who were guests. They went to a friend's home, and the police were called.

*Court Proceedings and Testing*

¶9. Jane filed for divorce in the Chancery Court of Harrison County on June 21, 2018, claiming grounds of adultery and habitual cruel and inhuman treatment. On that same day, she obtained a temporary restraining order (TRO) to keep John away from the home. John moved into a pool house at his parents' home. On July 6, 2018, the chancery court continued the TRO and appointed a guardian ad litem to provide the court with information about the

---

[4] In 2003, when she first began dating John, Jane's medical records reflect that she suffered from a mild dysplasia connected with HPV. She underwent a laser treatment for this abnormal cervical thickening at that time. Thereafter, she had an abnormal pap smear in 2006, but she had normal results thereafter through her last prior checkup in 2016.

[5] She was initially treated with a topical medication, which did not work. She then underwent laser surgery on August 10, 2018, to remove the warts.

children that the court could use to determine their best interest. The guardian ad litem interviewed the parties and the children and filed her report on July 25, 2018. She found the children to be well-behaved and adjusted and that they loved, and were loved by, both of their parents. Later, on August 10, 2018, the chancery court entered a continuing temporary order granting joint physical and legal custody to both parties, setting visitation, and ordering the parties not to disseminate private information about medical issues.

¶10. When John learned of Jane's sexual-disease diagnoses, he voluntarily underwent testing and was found negative for the genital herpes virus (HSV2). The parties agreed that there is no test for the HPV virus that causes genital warts; rather, a diagnosis is made from the presentation of the warts themselves, which John has never had. On August 8, 2018, contending that John did not take the correct test for herpes, Jane filed a motion for a Rule 35 examination of John to determine if he was a carrier of the HSV2 virus. *See* M.R.C.P. 35. John was tested again for HSV2, using the Titer's test that Jane's doctor had recommended. John tested negative on August 7, 2018, and again tested negative for HSV2 on November 6, 2018.

¶11. Jane propounded discovery on July 9, 2018, to which John failed to respond. After Jane filed a motion to compel, the parties agreed to an order that required John to respond by October 28, 2018. In responding to an interrogatory requesting the identification of his potential witnesses and their expected testimony, John merely provided the names of sixty-three individuals. Jane filed another motion to compel.

¶12. On November 29, 2018, John filed a motion for review of the August 10, 2018

5

temporary order, noting the results of his testing. On December 5, 2018, John also filed a motion for contempt. John attached an affidavit by Dr. Charles Guich, who said that "it is scientifically conclusive that [John] does not have nor has he ever had HSV2 and could not have infected anyone with HSV2." In his contempt petition, John also raised an incident where the children had gotten into the gun safe at the house, and he therefore sought custody of them for their safety.

*Jane's Visit to Dr. Nicholas Conger*

¶13. Meanwhile, Jane was referred by a doctor-friend to an infectious disease doctor, Nicholas Conger, not for treatment, but "to discuss transmission properties of herpes virus 1 and 2 as well as VZV and condyloma."[6] In his notes on the December 26, 2018 visit, Dr. Conger admitted that he did not have access to Jane's medical records from Dr. Mallett. Dr. Conger based his opinions solely on information provided by Jane. She told him that she was in her usual state of health until "out of the blue," she was diagnosed with condyloma.[7] She said John had been unfaithful in the marriage, and the doctor opined that "the fact that she never had any condyloma and then suddenly had condyloma is highly suggestive that her husband did pass that along to her." In a report he later prepared, Dr. Conger added "given [Jane's] history of normal pap smears throughout her life . . . and if [Jane] was monogamous with her husband, the virus must have been transmitted to her via relations with her

_____

[6] VZV is a virus causing shingles, which is not at issue in this appeal.

[7] Dr. Conger's medical records provide that Jane told the doctor that she contracted condyloma "two years ago."

husband." Notably, Jane failed to inform Dr. Conger that in her past, she did have abnormal pap smears and was treated for an HPV-related condition.

*Further Court Proceedings*

¶14. On January 15, 2019, the chancery court heard Jane's motion to compel answers to discovery and John's motion to review the August 10, 2018 temporary order. The court reviewed Jane's interrogatories question by question and ordered John to supplement his answers. It also ordered John to pay Jane $1,000 in attorney's fees. The chancery court heard testimony from both John and Jane concerning several incidents relating to their separation, their finances, and the needs of the children. On February 19, 2019, the chancery court entered an order concerning child support, contributions by the parties for the children's medical and school-related expenses, payment of bills relating to marital assets, and visitation. Deadlines for filing amended pleadings and for discovery were set and an order, signed on March 26, 2019, set the divorce for trial on August 29, 2019.

¶15. John filed his formal answer to Jane's divorce complaint on April 11, 2019. In the answer, John counterclaimed for divorce, alleging grounds of adultery and habitual cruel and inhuman treatment by Jane. On April 18, 2019, Jane filed a motion to strike John's answer as untimely, and a motion for sanctions for John's discovery abuses in failing to supplement his answers to interrogatories and in issuing numerous subpoenas. Although Jane filed the motion for sanctions in April 2019, she did not present it for hearing until after all testimony was taken at the trial, which was held August 26-30, 2019, and October 7 and 11, 2019. After a hearing on the sanctions motion in October, the chancery court found that John and

his attorney[8] had acted in bad faith and sanctioned each of them $2,500, for a total of $5,000.

*Trial Testimony*

¶16.    In her case-in-chief at trial, Jane testified to the problems in the marriage, including John's excessive drinking and pornography use.  She also testified about her diagnoses of sexually transmitted diseases (STDs), and her belief that John had infected her.  She called John as an adverse witness, and he denied Jane's allegations.  Jane also called Stacey, and she admitted to her developing relationship with John beginning in 2018, which she stated only became sexual in July 2018.  Jane also called Robert, a fellow soccer parent, who testified that he had seen John at soccer games with a Polar cup.  From the smell, Robert concluded it contained alcohol, but Robert could not identify what kind of alcohol.

¶17.    After Jane rested, John testified and then called Kathleen, a friend who had known John for years.  Kathleen testified that she had attended soccer games where John and the boys were present and that she has never seen John with any alcohol.  John called another friend and soccer-dad, Mark, who also testified that John did not drink alcohol at soccer games, although he had seen John with a Polar cup.  Mark also testified that he was present and witnessed the May 2018 altercation between John and Jane.  Mark said both were intoxicated that day.

¶18.    On rebuttal, after testifying herself and calling John to testify again, Jane called her boss, Cameron.  He testified that he received a subpoena from John that requested eight years

---

[8] On April 23, 2019, a new attorney entered an appearance on behalf of John.  The sanctions were imposed on John's first attorney.

of Jane's income records. He said that it would have taken him sixty hours to respond and that he is required to keep only three years of such records. He said he called John's attorney and they worked out a compromise of what Cameron then produced. Cameron also testified that he had not seen Jane under the influence of alcohol at work, but he has seen her drink to excess outside of work. In one instance in 2012 or 2014, he said that Jane had returned from a Mardi Gras parade with the two boys in the car, and she clearly had had too much to drink.[9] She drove off the driveway and into a ditch. Cameron also testified that prior to that, in 2003, Jane was ticketed for a DUI. Cameron also said that he often saw John at soccer games and that John always had a Polar cup with him, but Cameron did not know if there was any alcohol in it. Cameron testified that Jane was visibly more distraught as the divorce has gone on but that the quality of her work has not suffered.

¶19.    Notably, neither John nor Jane called any medical doctor or nurse to testify live or by deposition about the genesis or transmission of Jane's diagnosed STDs. The only medical evidence in the record consisted of the medical records of the parties; the depositions of Nurse Practitioner Kathleen Arnold, who treated John's diabetes,[10] and Dr. Wyble, who was Jane's Botox and cosmetic-surgery doctor; the affidavits of Dr. John Mallett and Dr. Gruich; and Dr. Conger's unsworn report.

---

[9] Jane admitted this incident, which she called a "mistake" on her part. She said she was not aware of the alcohol content of what she drank at the parade and that she safely made it home.

[10] Nurse Practitioner Arnold said that, for the most part, John has complied with the things she has asked him to do for his health. She admitted that John has had some episodes of either hyper- or hypo-glycemia, but he is currently stable with the pump he has.

*Chancery Court's Rulings*

¶20.   After considering the testimony and evidence, the chancery court convened the parties on December 2, 2019, to read its judgment, which was reduced to writing thereafter and entered on February 3, 2020.  John filed a motion for reconsideration, which the chancery court heard on June 22, 2020.  Thereafter, the chancery court issued a revised findings of fact and opinion on July 6, 2020.

*Appeal*

¶21.   On August 4, 2020, John filed his notice of appeal.  On appeal, John alleges that the chancery court erred (1) in finding that John committed pre-separation adultery; (2) in its finding that John transmitted an STD to Jane; (3) in its equitable distribution of certain personal property of the parties; (4) in its determination of Jane's income; (5)  in denying John's request for alimony; (6) in not reducing the amount of child support ordered; and (7) in its imposition of sanctions.

**Standard of Review**

¶22.   "This Court will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020) (quoting *Branch v. Branch*, 174 So. 3d 932, 937 (¶9) (Miss. Ct. App. 2015)).  A chancery court's ruling will be upheld if it is supported by the credible evidence.  *Byrd v. Byrd*, 100 So. 3d 443, 447 (¶5) (Miss. 2012).  "[W]e review the facts involved in rendering a divorce decree in a light most favorable to the appellee."

*Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020). Issues of law are reviewed de novo. *Oswalt v. Oswalt*, 981 So. 2d 993, 995 (¶5) (Miss. Ct. App. 2007).

¶23. "When this Court reviews a chancellor's judgment of property division we 'are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.'" *Farris v. Farris*, 202 So. 3d 223, 230 (¶27) (Miss. Ct. App. 2016) (quoting *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007)).

**Discussion**

I.     **Whether the chancery court erred in its findings concerning John's alleged pre-and post-separation adultery.**

¶24. John argues that the chancery court erroneously found that he committed pre-separation adultery and that Jane's proof of such did not meet the "clear and convincing" standard required to establish pre-separation adultery. But the chancery court specifically said that it did not grant Jane a divorce on the grounds of pre-separation adultery but upon John's admission of post-separation adultery. The court did not hold that John had committed adultery prior to the separation. Accordingly, we find no merit to John's argument.

¶25. In its findings of fact, conclusions of law and final judgment of divorce, the chancery court found that Jane had "proven, by clear and convincing evidence, her entitlement to a divorce from John on the ground of adultery." After John filed his motion for reconsideration, the chancery court added to its opinion the following:

> In his Motion for Reconsideration, John moved the Court to strike its finding of pre-separation adultery. The Court, however, did not base its determination

11

that [Jane] had proven adultery on PRE-separation adultery. It found that Jane had met her burden of establishing adultery with John's admission to POST-separation adultery. While the Court <u>recounted evidence</u> discussing the possibility of pre-separation adultery, it did not state that this evidence was the basis of its finding.

Nowhere did the chancery court hold that John committed adultery before the separation. The court only said that the evidence "suggested" that John was engaging in a "romantic and sexually motivated relationship" before the separation, not adultery.

¶26. "In Mississippi one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination [of the offending party] and a reasonable opportunity to satisfy that inclination." *Williams v. Williams*, 303 So. 3d 824, 831-32 (¶28) (Miss. Ct. App. 2020) (quoting *Holden v. Frasher-Holden*, 680 So. 2d 795, 798 (Miss. 1996)). The adultery may occur before or after separation. *Talbert v. Talbert*, 759 So. 2d 1105, 1110-11 (¶16) (Miss. 1999). "Adultery may be shown by evidence or admissions, and either is sufficient to support a decree of divorce." *Id*. When a chancellor makes findings of fact concerning adultery, this Court will not set aside those findings unless they are manifestly wrong. *Id*.

¶27. John argues that Jane's evidence of pre-separation adultery was not clear and convincing. But this argument is irrelevant to the facts relied upon by the chancery court to grant Jane the divorce. John ignores his own admission of post-separation adultery, which was corroborated by Stacey, and which alone is sufficient proof to support the chancery court's finding of adultery. As we noted in *Curtis v. Curtis*, 796 So. 2d 1044, 1051 (¶31) (Miss. Ct. App. 2001):

The [Mississippi] Supreme Court has noted that "nothing in our jurisprudence requires that a ground for divorce, such as adultery, arise before separation." *Talbert v. Talbert*, 759 So. 2d 1105, 1110-111 (Miss. 1999). Though the *Talbert* court stated the point somewhat conditionally, we have found no authority to require that the adultery must precede the separation. It is only necessary that it precede the divorce.

*See also Dykes v. Dykes*, 191 So. 3d 1287, 1291 (¶22) (Miss. Ct. App. 2016) (This Court has held that "there is no requirement that the adultery precede the spouses' separation." (citing *Lister v. Lister*, 981 So. 2d 340, 344 (¶29) (Miss. Ct. App. 2008)). Because the chancery court made no finding of pre-separation adultery, and because there was sufficient proof of post-separation adultery to meet the burden of proof and support the chancery court's grant of divorce to Jane, we find that the chancery court was not manifestly wrong in its finding that Jane was entitled to a divorce on the ground of John's adultery.

**II.     Whether the chancery court erred in its finding that John transmitted an STD to Jane.**

¶28.    The chancery court found that John provided no evidence that Jane had engaged in extramarital relations and that the circumstantial evidence Jane presented established that John had infected her with a sexually transmitted disease (HPV). The chancery court said that Jane had never been diagnosed with HPV prior to June 14, 2018, although fifteen years prior, she had been treated for a mild cervical dysplasia. The court found that there was no proof presented that these two medical occurrences were linked. Although it may be possible, the chancery court said, due to the time frame, it is more reasonable to infer that Jane was infected three weeks to eight months prior to June 14, 2018, especially since she had had normal pap smears since 2008.

13

¶29. On appeal, John contends that Jane presented no expert testimony on the issue, and that the chancery court's finding was manifestly wrong. Consequently, John argues, he should not be ordered to reimburse Jane for the $1,038.40 medical expense for her HPV treatment, nor should the erroneous finding that he infected Jane be used in the chancery court's evaluation of the *Ferguson* factors, *see infra* note 17, when dividing marital assets.

### A. Evidence in the Record

¶30. In this case, the evidence showed that on June 14, 2018, Jane was diagnosed with two STDs: genital warts (condyloma), which is caused by the human papilloma virus (HPV), and genital herpes that is caused by the HSV2 herpes virus. Although Jane's swab test for genital herpes by Dr. Mallett on June 14, 2018, was negative, the results of her blood test a month later were positive for the genital herpes virus HSV2. During her treatment for the disease, Jane learned from Dr. Conger that she was a carrier of the genital herpes virus, although she denied ever having an outbreak. John was tested three times for genital herpes, and all test results were negative. His doctor, Dr. Gruich, said in an affidavit that John did not have the virus and could not have given it to Jane. Consequently, there was no proof that John had genital herpes, and Jane ultimately withdrew her claim that John had given her genital herpes.[11]

¶31. But Jane continued to contend that John had given her the genital warts (condyloma).

---

[11] Despite this withdrawal, Jane admitted that she had told her mother and close friends that she had herpes and that John gave it to her. Jane also conceded that when John told others he did not have herpes but that she did, he was just responding to gossip that Jane herself had initiated.

14

Jane's medical records show that back in 2003 she was treated for a "low grade squamous intraepethial lesion encompassing HPV, mild dysplasia, CIN1." Thus, the records indicate that she carried some HPV virus in 2003 and developed a condition as a result. Jane testified that HPV in the cervix is not an STD, but HPV on the labia causing condyloma is an STD. John objected to this medical opinion testimony from Jane. Citing no medical authority, the chancery court took judicial notice of the fact that there are hundreds of strains of HPV viruses and that some cause condyloma, and others cause dysplasia (abnormal cell buildup).

¶32. The only information on condyloma from a medical doctor in the record is one paragraph in the unsworn report of Dr. Conger, the infectious disease doctor:

> Condyloma acuminate (CA) from HPV, on the other hand, is always transmitted through intimate contact, and generally manifests symptoms from 3 weeks to 8 months from initial exposure, with an average of 3 months. It usually presents with genital warts; long term it can lead to cervical cancer. Given [Jane's] history of normal pap smears throughout her life and with the diagnosis of CA made on June 14, 2018, this is entirely consistent with her report that she stopped having sex with her husband on May 26, 2018. Therefore, if [Jane] was monogamous with her husband and their sexual relations ended in May, 2018 as described above, the virus must have been transmitted to her via her relations with her husband, and he would have had to have acquired it via relations with another outside of their marriage.

But Dr. Conger had not reviewed Jane's past medical records, and he based his opinion solely upon Jane's representations to him, including a representation that her pap smears all her life had been normal. Jane failed to tell Dr. Conger about her abnormal pap smears in 2003 and 2004 indicating HPV involvement and the treatment she received then. Even Dr. Mallett's records in 2009 noted that Jane had a history of abnormal pap smears, yet Jane told Dr. Conger that all her pap smears had been normal. Not only was Dr. Conger's opinion

15

based on incorrect and incomplete information, but his opinions were not given to a reasonable degree of medical probability.

¶33.    The parties and the court all agreed that there is no test for HPV.  So John could not be tested to confirm whether he had the HPV virus that caused Jane's condyloma.  But John has never suffered from genital warts, and there was no other proof entered into the record that he had or carried the HPV virus.  The record is clear that John tested negative for genital herpes (HSV2) several times, and the only person with that disease was Jane.  In addition, John's sexual relations with Stacey, at least post-separation, were established, and Jane admitted that the medical records Stacey provided showed that Stacey had no STDs.  Despite this information in the record, the chancery court still found that it was reasonable to infer that John had transmitted the disease to Jane.  We disagree and find the chancery court's ruling unsupported by the evidence and manifestly erroneous.  In addition, the record reveals that the foundation of the chancery court's finding that John transmitted the genital warts to Jane is not based on any medical evidence presented, but instead on the court's own improper judicial notice of critical medical facts and on an improper shifting of the burden of proof.

B.    *Judicial Notice*

¶34.    Significantly, Jane failed to present any medical doctor to testify, either live or by deposition, and opine that John had given Jane the disease.  The only mention of the transmission of Jane's genital warts is found in Dr. Conger's unsworn report, yet his opinion was not grounded in accurate facts, as noted above.  But on several occasions, the chancery court took judicial notice of key "facts," including the following:

16

1.  The strains of HPV, its effects on the body, testing for viruses, and that the body clears the HPV virus on its own:

> I am going to take judicial notice of something, ok, that I think is basically just as a female since we all have to go every year and get PAP smears, I think we all have a general knowledge of this, and *I'll take judicial notice of that, but that's what a PAP smear is doing is determining if there are abnormal cells that would be a result of an HPV viral infection, of which there are hundreds and hundreds.* Ok. But, yet, you can test for HPV like you can any virus such as the flu . . . . Like you can have the flu and know, you have the flu for ten days or a week, and you will test positive for the flu. But then once you are over the flu infection, you will no longer test positive for the flu because your body has cleared itself of the infection. That's the way a viral infection works. So that's the end of the story. You can have symptoms of a virus and have to be treated for those symptoms but no longer be positive for the virus because your body has flushed the infection. And I'll just take judicial notice of that. Now, what actually went on in this case, I don't know. But, you know, you don't always have to, you know—doctors can diagnose things like the flu, for example, and not even do a swab. They'll just say based on the symptoms, I'm going to treat you for the flu.

(Emphasis added).

2.  The meaning of terms in Jane's 2003 medical record, which diagnosed her with "LSIL encompassing: HPV/mild dysplasia," and that there are hundreds of HPV virus strains causing different conditions:

> Again, this is what I was trying to do, just looking at common definitions, just even in the dictionary, which I think the Court can do, and take judicial notice of dysplasia, for example. Just the common definition of dysplasia is an abnormal development or growth of tissues, organs or cells. And so that's what we're looking for when we're talking about precancerous cells. So dysplasia is noted on the cervix. That's where, you know, not

17

always, but in her situation that's where the dysplasia was found, and that's what the laser ablation was done for.

Again, just taking judicial notice of the fact that there are hundreds of strains of HPV that don't all cause the same thing. So some of the strains cause condyloma, which is genital warts. Some of the strains cause dysplasia. It's just—they do different things. There are hundreds, hundreds.

Ultimately, the chancery court found that based on Dr. Mallett's and Dr. Conger's medical records, "it is reasonable to infer Jane contracted vaginal condyloma . . . as a result of HPV infection passed to her from John." In his motion for reconsideration, John objected to the chancery court's taking judicial notice of facts pertaining to these infectious diseases without medical testimony. We agree that the chancery court exceeded its judicial-notice authority.

¶35. Rule 201 of the Mississippi Rules of Evidence governs the material of which a court may take judicial notice:

(a) Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

MRE 201(a)-(b). The Rule's Advisory Committee Note explains the two types of information that may be judicially noticed:

Subdivision (b) provides that only certain kinds of facts may be susceptible to judicial notice. The first kind of fact that can be judicially noticed is one that is commonly known in the jurisdiction in which the court sits. The judge

18

himself need not know the fact. Indeed, it is altogether irrelevant whether he does. The test is whether the fact is common knowledge in the area. The use of judicial notice for matters of common knowledge has long been practiced in Mississippi. On what street the local department store is located is the kind of commonly known fact of which a court may take judicial notice. The second kind of fact susceptible to judicial notice is one readily ascertainable. This would include such items as maps, census data, mortality tables, dates and time, and history. *See* Ellis and Williams, *Miss. Evid*. § 12-2 and the cases cited therein. *See also Nicketta v. National Tea Co.*, 338 Ill. App. 159, 87 N. E. 2d 30 (1949), and *Walls v. Mississippi State Bar*, 437 So. 2d 30, 33 (Miss. 1983).

Subdivision (b) does not allow judicial notice to be used when the fact is a dubious one or one in controversy.

MRE 201 advisory committee note (b).

¶36. The Encyclopedia of Mississippi Law echoes these parameters for taking judicial notice, saying that Rule 201 only allows a trial court to take notice of "adjudicative facts" that are "easily understood." 4A Jeffrey Jackson et al., *Encyclopedia of Mississippi Law* § 33:13 (3d ed.) (updated Oct. 2021).

There are two paths by which a fact might travel to be judicially noticed. It can either be generally known within the territorial jurisdiction of the trial court or be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

*Id*. Thus, judicial notice could be taken of the county in which a city is located or that a search warrant's execution at 11:00 p.m. was not during daylight hours. *Id.*

¶37. Under Rule 201, "[a] court may look to any source it deems helpful and appropriate, including official public documents, records and publications." *Riverview Dev. Co. LLC v. Golding Dev. Co. LLC*, 109 So. 3d 572, 576 (¶13) (Miss. Ct. App. 2013); *see also Stokes v. Kentucky*, 275 S.W.3d 185, 189 (Ky. 2008) (The State was allowed to read into the record

the definition of "psychogenic" from a medical dictionary, and on appeal the Kentucky Supreme Court said, "Specifically, judicial notice may be taken of the definitions of medical terms from a medical dictionary."). *Id.* But in this case, the chancery court cited no sources for the facts of which it took judicial notice, not even the "dictionary" that it referred to.

¶38. While it may have been acceptable for the chancery court to take judicial notice that HPV is a virus, which may be common knowledge, the chancery court exceeded its authority when it determined the diseases that various strains of the HPV virus can cause and when it found that it was unreasonable to think that a strain present in 2003 would cause genital warts in 2018. These findings are not matters of common knowledge or readily determined without dispute but require opinion testimony from a competent medical expert.

¶39. Moreover, the chancery court said that HPV can be tested for by a pap smear, drawing the court's own personal experience. However, "[w]hat a judge knows and what facts a judge may judicially notice are not identical data banks. . . . It is not a distinction easy for a judge to follow in application, but the doctrine is accepted that actual private knowledge by the judge is not sufficient ground for taking judicial notice of a fact as a basis for a finding or a final judgment. . . ." 1 *McCormick on Evidence* § 329 (5th ed. 1999).

¶40. In this case, the genesis of Jane's genital warts was a controverted issue and should not have been resolved by inferences drawn by improper judicial notice of medical facts.

### C. Burden of Proof

¶41. In this case, Jane contended that John transmitted the genital warts to her; therefore, she had the burden of proving this transmission. *See Hinton v. McKee*, 329 So. 2d 519, 521

(Miss. 1976) ("[T]he party whose case requires the proof of [a] fact has all along the burden of proof."); *Harris v. Sims*, 155 Miss. 207, 124 So. 325, 328 (1929) (holding that the party having burden of proof must first give "competent and prima facie evidence of a fact" before the burden shifts to the other party). Matters of medical causation are not appropriately established by judicially noticed facts.[12]

¶42. In domestic-relations cases, medical evidence (either testimonial or documentary) is always appropriate but not always necessary to support a chancery court's findings on the allegations of the transmission of diseases between the parties. For example, in *Farris v. Farris*, 202 So. 3d 223, 232 (¶32) (Miss. Ct. App. 2016), we found that the evidence supported a chancery court's finding of a husband's transmission of an STD because he admitted exposure to the disease from his first wife. He testified that his first wife told him she had herpes, but he himself was never tested. *Id*. However, he admitted that he never told his second wife about his exposure until she contracted the disease. *Id*. In that case, there was medical evidence that the second wife had herpes and an admission from the husband that he never told her he had been exposed prior to their marriage was sufficient to support the chancery court's finding that he had probably transmitted the disease to her.

¶43. But in *Moses v. Moses*, 879 So. 2d 1043, 1048 (¶12) (Miss. Ct. App. 2004), we found

---

[12] For example, in *Fielder v. Bosshard*, 590 F.2d 105, 110-11 (5th Cir. 1979), the appellant challenged a jury verdict for loss of future earnings by saying that the plaintiff would not live long enough to earn that much because only twenty percent of his liver remained healthy. The Fifth Circuit Court of Appeals rejected appellant's argument because he had not presented any *medical testimony* on the issue and further said that "[c]ertainly the loss, if any, in life expectancy occasioned by impairment in function in a portion[,] even a large portion[,] of one's liver is not a matter of common knowledge, let alone judicial notice." *Id.* (emphasis added).

that a wife presented no credible evidence to establish that her husband transmitted numerous STDs to her. The only evidence the wife offered as to the source of her diseases was her own testimony because the testimony of her doctor merely concerned treatment, not causation. *Id*. at (¶11). The wife's medical records showed that she had herpes before the marriage, but she presented no proof that her husband also had herpes before they married. *Id*. at (¶12). These medical facts contradicted her claim that he gave her the STD prior to the marriage. Moreover, if her claim were true, then she married him knowing this information, which could not support the ground of habitual cruel and inhuman treatment. *Id*.

¶44. In this case, the medical records of the parties showed that Jane had herpes and genital warts and that John had neither disease. His medical testing showed he was not a carrier of herpes. John vehemently denied having any STD exposure at any time. There was no sound medical testimony to establish that John transmitted the disease—only Dr. Conger's unsworn report that was based solely on Jane's information that was shown to be inaccurate and not based on a review of the parties' medical records. Thus, in this case, Jane did not meet her burden of proof.

¶45. In addition, Jane's medical records also showed that prior to the marriage, she had been diagnosed with an HPV-related condition. Yet the chancery court, noting Jane's HPV diagnoses in 2003 and later in 2018, determined that "there was no proof presented that these two medical occurrences were linked." In other words, instead of placing the burden on Jane to prove there was no link, the chancery court improperly placed the burden on John to prove that the two occurrences were linked. The chancery court concluded that "it was

22

unreasonable to conclude that the HPV virus that caused Jane's genital warts in 2018 was the same HPV virus that caused her dysplasia in 2003." But there was no medical record or testimony to support this medical conclusion that the chancery court used to resolve the disputed fact of how Jane contracted this disease.

¶46. In summary, we find that the evidence in the record did not support a finding that John had transmitted genital warts to Jane. We further find that the chancery court improperly took judicial notice of key medical facts and improperly placed the burden of proof on this issue on John. We reverse the chancery court's order that John reimburse Jane for the $1,038.40 in medical expenses associated with her treatment for condyloma.

### III.    Whether the chancery court erred in its equitable distribution of certain personal property of the parties.

¶47. John challenges the chancery court's classification of his Prudential Life Insurance policy, the court's valuation of certain items of personal property, and the court's overall distribution of the parties' marital assets and debts whereby John claims he received only $37,942 of the parties' assets valued at $223,201.

¶48. In equitably dividing the assets of divorcing parties, the chancery court must first classify their assets as either marital or non-marital. *Lageman v. Lageman*, 313 So. 3d 1075, 1080 (¶8) (Miss. Ct. App. 2021); *Hemsley v. Hemsley*, 639 So. 2d 909, 914-15 (Miss. 1994). "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside of the marriage." *Williams v. Williams*, 303 So. 3d 824, 833 (¶33) (Miss. Ct. App. 2020); *Marter v. Marter*, 95 So. 3d 733, 737 (¶12)

23

(Miss. Ct. App. 2012) (explaining that assets that belong to one party prior to the marriage are considered non-marital property and are not subject to equitable distribution). "The burden is upon one claiming assets to be non-marital to demonstrate to the court their non-marital character." *Lageman*, 313 So. 3d at 1080 (¶8).

¶49. After classification of the assets, the chancery court must value and equitably divide the property according to the guidelines set forth in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). "To equitably divide property, the chancellor must: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets. *Williams*, 303 So. 3d at 833 (¶33). An equitable division does not necessarily mean an equal division. *Id*. at (¶34). "However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Bowen v. Bowen*, 982 So. 2d 385, 394 (¶33) (Miss. 2008).

### A. Classification of the Prudential Policy

¶50. In this case, John had two Prudential insurance policies. First, he had a $105,000 Prudential Life Insurance policy, ID number 8115764, which was issued on October 4, 1999, prior to John and Jane's marriage. John testified that he obtained this group life policy through his employment at that time (Prudential Financials) and that his parents maintained it after he left that employment because it was hard for him (a diabetic) to get life insurance. His father was the named beneficiary on the policy, and the monthly premiums as of June 25, 2003 were $12.64. The cash value of this policy as of December 2018 was $1,276.89. The chancery court correctly found that this $105,000 life insurance policy procured by John prior

to the marriage and maintained throughout the marriage by his parents was not marital property.

¶51.   In his Rule 8.05 financial statement, *see* UCCR 8.05, John reported that he had another $100,000 Prudential Life Insurance Policy (V6010690) that named Jane and one of the children as beneficiaries.  He reported the cash value of this policy to be $42,856.  John testified that this policy was also obtained prior to his marriage when he was employed by Prudential Financials.  At the January 2019 hearing, John said that he intended this policy to be used for his children's education if needed.

¶52.   John further testified both Prudential policies were maintained by his parents.

    A.    Let me explain something that has been tossed around.  I cannot get anymore life insurance being a type one diabetic.  They don't offer it. They were given years and years before through work employment.  So my insurance amount, that's what it is, unless I'm [in a] group policy.

    Q.    That would be all the more reason to maintain the ones you testified that you have, correct?

    A.    I'm going to maintain them.

    Q.    And you're going to maintain them with children as beneficiaries?

    A.    Yes.  Children or parents, because my parents are the ones who have kept those up.

¶53.   At trial, John testified that marital assets were not used to pay the premium for the $100,000 policy that he listed on his financial statement.  He produced a bank statement from a joint account he had with his mother that showed a draft of $145 per month for payment of the Prudential Insurance policy premium.  John said that his mother would transfer funds into the account to maintain it, and the only debit on the account was for the $145 monthly

25

insurance premium. Jane presents no proof to dispute this arrangement.

¶54. Despite John's testimony, which was not rebutted or contradicted by any other evidence, the chancery court said:

> In contrast to the other policy and accounts listed on John's 8.05, there was no supporting documentation in the form of statements or other exhibits to corroborate the details of this policy, i.e. value, how payments were made, etc. However, in her testimony, Jane referenced a whole life Prudential policy that John claimed would pay for the boys' college expenses. The Court therefore deduces that this Prudential policy is the same one referenced on John's 8.05 because it is listed on John's 8.05 with a cash value, and the beneficiaries are Jane and [one of the minor children[13]]. Without evidence to the contrary, the Court presumes it was funded with marital funds and is therefore a marital asset subject to division.

The chancery court proceeded to list the $100,000 policy with cash value of $42,856 as a marital asset and assigned that value to John's share of the marital assets. The chancery court was clearly in error in this finding.

¶55. "For purposes of a divorce proceeding, marital property consists of 'any and all property acquired or accumulated during the marriage.'" *Marter*, 95 So. 3d at 737 (¶12). "[I]f the non-owning spouse claims a partial portion of the separate asset's appreciation, most courts require the non-owning spouse to prove that marital contributions were made to the separate property asset and that it increased in value." Deborah H. Bell, *Mississippi Family Law* § 6.03[4][b] (3d ed. 2019).

¶56. In this case, the testimony and documentary proof in the record undisputedly show that the two Prudential policies were purchased before the marriage, which would establish them as part of John's separate estate going into the marriage. Jane presented no evidence that any

---

[13] For privacy concerns, this phrase is substituted for the name of the minor child.

marital funds were used to pay the premiums on these accounts, which would be the proof needed to convert either policy to marital property. Neither party listed payment for either of these policies as a monthly expense on their Rule 8.05 financial statements. None of their bank statements entered into the record (from their joint account or Jane's personal accounts) reflected any payments made for a Prudential Life Insurance policy premium. The source of premium payments is key on this issue, as the Mississippi Supreme Court said in *Traxler v. Traxler*, 730 So. 2d 1098, 1100 (¶6) (Miss. 1998), where the husband's life insurance policy with a cash value was purchased by his mother and found by the chancery court not to be a marital asset. On appeal, the Mississippi Supreme Court remanded the issue for a determination of the account from which the premiums were paid. *Id*. at 1105 (¶39). Here, Jane presented no evidence to rebut the testimony and documentary proof presented by John that the premiums on the $100,000 policy were paid by his parents through a joint account that his mother had with John. Therefore, because the premiums were not paid with marital funds, the chancery court erred in classifying $100,000 policy as a marital asset. Given the large amount of the cash value that the chancery court allocated to John as a result, this error requires a remand of this case for the chancery court to re-compute the equitable division of the parties' actual marital assets, which we hold do not include the Prudential Insurance policies.

<strong>B.</strong>     <em>Chancery Court's Valuation of Personal Property</em>

¶57.    John also challenges the chancery court's $30,000 valuation and allocation of the parties' personal property, include a Mahindra tractor, a 4-wheeler, furniture, appliances,

27

fishing gear, and tools.

¶58.    "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Horn v. Horn*, 909 So. 2d 1151, 1164 (¶47) (Miss. Ct. App. 2005) (quoting *Ferguson*, 639 So. 2d at 928). "A chancery court's findings on valuation may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence." *Marter*, 95 So. 3d at 739 (¶20) (internal quotation marks omitted). "If a party fails to provide accurate or sufficient information or cooperate in the valuation of an asset, the chancellor is entitled to proceed on the best information available to him or her." *Lageman*, 313 So. 3d at 1080 (¶8). However, when the record lacks any evidence of valuation of property, the chancery court has no basis to move forward with any equitable distribution of it. *King v. King*, 760 So. 2d 830, 836 (¶20) (Miss. Ct. App. 2000).

¶59.    We have reversed cases where the chancery court has failed to value the marital personal property assets. *See Horn*, 909 So. 2d at 1164 (¶48) (reversing property division for failure to value assets when only evidence was couples' conflicting statements of value); *Ward v. Ward*, 825 So. 2d 713, 718 (¶15) (Miss. Ct. App. 2002) (failure to value ten horses, saddles, tack, a mobile home, and vehicles); *Wilson v. Wilson*, 811 So. 2d 342, 346 (¶¶13-14) (Miss. Ct. App. 2001) (reversing for failure to value front-end loader, trailer, and subsoiler).

¶60.    In this case, John listed his 16-foot boat, a Honda 4-wheeler, a Mahindra tractor, a golf cart, furniture, appliances, and computers  as "other assets" on his Rule 8.05 financial

28

statement. However, he listed no value for these items. Jane testified that the tractor was not marital property and belonged to her parents. Although the chancery court listed several of these items in its findings, it gave no specific values for these items. Instead, relying on Jane's claim that John valued his fishing equipment at $20,000 (Jane testified that John had said several of his rods cost a thousand to two thousand dollars each.) and Jane's testimony that she valued his tools between $15,000 and $16,000, the court set a value of $30,000 "for the items listed" and allocated $30,000 to John for "personal property" in the court's division of the marital property. Yet the court assigned a $0 value to the personal property that Jane kept.

¶61. Contrary to Jane's testimony, John testified that the fishing equipment was not worth more than $1,000,[14] and although he removed personal items from the house under the court's supervision,[15] he took no furniture or appliances from the house; he took only the boat. The record is unclear who had the golf cart or the tractor. Jane did not testify nor provide any documents pertaining to the value of any of the other items (furniture, appliances, etc.) that John listed.

¶62. Although a chancery court may use the best information available to it in valuing personal property, in this case, there was no information available to the chancery court to

---

[14] John said, "I grew up fishing out front. Those sea reels and deep-sea reels $2,000? Really? That's nothing but a farce. Those reels aren't worth half that." He said the reels were his father's from the 1970s, 1980s, and 1990s.

[15] The chancery court had allowed John to remove his personal items from the house, ordered that the attorneys be present when he did so, and what he took was to be recorded. Although the parties met at an appointed time, and John removed items, no list was ever provided to the chancery court as to what items John took.

draw upon for the values of the parties' marital personal property which included a boat, 4-wheeler, golf cart, potentially the tractor, furniture, appliances and computer equipment. Neither John nor Jane provided any values for these items on their Rule 8.05 financial statements and neither testified to their value.[16]

¶63. We find that the chancery court was manifestly in error in its valuation and distribution of this property. Without proper valuation of the parties' marital personal property, the chancery court's division must be reversed. Again, $30,000 is a large amount to assess a party without documentation of all the personal property listed. On remand, the chancery court should request the parties to provide adequate evidence as to the values of items they claim to be marital personal property and report who has possession of these items. Moreover, the chancery court should include the value of each item in its equitable division. "In cases where the chancellor failed to make findings on the fair market value of the various assets prior to division, we have reversed and remanded for such findings because 'it is impossible for this Court to perform its oversight responsibility in the absence of such a valuation.'" *Horn*, 909 So. 2d at 1164 (¶47) (quoting *Scott v. Scott*, 835 So. 2d 82, 87 (¶13) (Miss. Ct. App. 2002)).

### C. Community Bank Debt

¶64. In the court's original order granting the divorce and dividing the marital assets and debts, the chancery court equally allocated an $18,000 debt owed by the parties to

---

[16] If the chancery court included a value for the tractor in its $30,000 valuation of "items listed," it clearly erred in doing so because Jane testified, without any dispute from John, that the tractor belonged to her stepmother.

Community Bank and required each of them to pay $9,000. As its rationale for doing so, the chancery court stated, "While John denied responsibility for the loan, Jane testified that it was procured to pay off debts accrued by both parties." After John filed his motion for reconsideration and argued that the Community Bank debt was largely due to Jane's extravagant spending, the chancery court revised its allocation and required John to pay the full $18,000 amount. The chancery court offered no reason for the change, merely stating, "While there was significant testimony regarding Jane's spending, she counters that the debt represented a large conglomeration of both parties' spending over the years and she should not be assessed with a larger share."

¶65. Debts are classified similarly to assets for purposes of equitable distribution. Debts incurred by a spouse prior to the marriage are usually classified as separate from marital debt. Debts incurred for the benefit of both parties or the family are considered marital debt. *Doyle v. Doyle*, 55 So. 3d 1097, 1108 (¶32) (Miss. Ct. App. 2010). Here, the chancery court determined that the Community Bank debt was marital and initially divided it equally between the parties. However, the chancery court later changed the allocation, giving no rationale for the change. Nothing in the record supports the chancery court's allocation of the full debt to John. In fact, the record contradicts the chancery court's own finding that the debt was the result of both parties' actions. Accordingly, on remand when revising its equitable division of the marital assets and debts, the chancery court should equally divide the Community Bank debt and allocate $9,000 to each party or give a reason for doing otherwise.

31

### D.	Jane's Share of John's Annuity

¶66.	John also challenges the chancery court's allocation of his $28,539.24 New York Life Variable Annuity. Jane's only annuity was valued at $13,301.67, but the chancery court also allocated to her all the equity in the home valued at $62,044.34. The combined total of these items alone is $75,346.01. The chancery court allocated to John his PERS retirement account of $22,745.69, a Roth IRA of $5,998.66, and a Stifel account of $13,674.11. This totaled $42,418.46. Despite the shortfall to John, the chancery court's initial order awarded Jane sixty percent of John's New York Life Variable annuity, valued at $28,539.24, presumably in an effort to equalize the asset/debt share of the parties. After John filed his motion for reconsideration, the chancery court increased Jane's share of this annuity to seventy percent but gave no explanation for doing so.

¶67.	Because we are remanding this case for the chancery court to revise its equitable division of the couple's marital assets and debts, this allocation of John's annuity will need to be revisited, especially in light of the rulings of this Court. This includes our ruling that the chancery court erroneously held that John transmitted an STD to Jane. In its analysis of the *Ferguson* factors,[17] the chancery court included findings that John intentionally harassed and publicly humiliated Jane by the issuance of subpoenas and concluded that John sought to sabotage Jane personally and professionally. As noted below in the discussion on

---

[17] In equitably dividing marital property, the Mississippi Supreme Court outlined a number of factors the chancery courts could consider in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). These include, but are not limited to, the contribution of the parties to the accumulation of the property, the withdrawals made by any party from joint assets, the values of the assets, tax consequences, and "any other factor which in equity should be considered." *Id.*

sanctions, we find that the evidence does not support such a finding. Yet, in its *Ferguson* factor analysis, the chancery court found that "John's behavior has potentially damaged [Jane's] reputation in the community as least temporarily." There was no testimony from anyone other than Jane about this alleged damage to her reputation. Even her employer testified that the quality of her work had not suffered. On remand, the chancery court shall reassess the evidence presented in accordance with this opinion and re-assess the *Ferguson* factors to determine what, if any, percentage of John's New York Life annuity to award to Jane.

### IV. Whether the chancery court erred in its determination of the income of the parties.

¶68. As of July 6, 2020, the chancery court found that Jane's net monthly income was $3,687.58.[18] The chancery court accepted Jane's claimed gross monthly income of $6,194 from salary and wages, as well as Jane's reasons for the drop from the $11,363 per month she was making in June 2018. Jane said that the stress of the litigation, John's harassment and humiliation of her by naming over sixty potential witnesses, and his issuance of numerous subpoenas duces tecum were the reasons for her reduced income. The chancery court found that John had "sought to sabotage Jane personally and professionally." On appeal, John challenges Jane's claim of such a reduction in income from her employment that the chancery court accepted, arguing that the court's analysis is contrary to the evidence.

---

[18] It is uncertain how the chancery court arrived at this figure because Jane reported on her July 25, 2019 Rule 8.05 financial statement that her net monthly income was $3,724.43.

¶69.    Numerous findings of a chancery court in a divorce case (including child support[19] and attorney's fees[20]) depend on as accurate a determination of the parties' income as is possible. In this case, Jane's sole source of personal income was her employment with Cameron's real estate company.  However, how the chancery court computed that income is unclear and contradicted by some evidence presented.

¶70.    In her July 25, 2018, Rule 8.05 financial statement, Jane reported a monthly gross income of $11,363 from this employment.  She testified that this figure was based on her 2017 tax return.  Jane never produced her 2018 tax return, although she testified that she made approximately $9,166 per month gross in that year.  She also testified that she had not set aside the $2,000 per month for taxes after June 2018.  John then subpoenaed documents from Cameron's real estate company, Jane's employer, to determine Jane's income after June 2018.  In response, Cameron provided checks paid to Jane from June 2018 through March 29, 2019, which were entered into evidence.  Cameron's records reflect that in the first three months of 2019, Jane was paid $28,609, or an average of $9,536 gross each month.  If the $2,000 per month for taxes were subtracted, Jane's adjusted gross income would be $7,536 per month, approximately $1,400 per month more than what the chancery court found.

¶71.    It is clear from the records provided, including past tax returns through 2017, that Jane's monthly income ranged from a low of $11,296 in 2014 to a high of $14,554 in 2015.

---

[19] The amount of child support is based on a percentage set by statute applied to a party's adjusted gross income. Miss. Code Ann. § 43-19-101(1).

[20] *See Drumright v. Drumright,* 812 So. 2d 1021, 1032 (¶37) (Miss. Ct. App. 2001) (disparity of the parties' incomes warranted an award of attorney's fees).

The records subpoenaed from her employer also show that Jane's income can vary significantly from month to month. For example, in January 2019, she was paid $4,265, but in February and March of 2019, she made $11,436 and $12,908 respectively. Additionally, her employer's records show that from June 2018 through March 2019 (ten months), Jane was paid $83,609.13. This averages to $8,360.91 per month, not $6,194.43 per month as Jane claimed on her revised Rule 8.05 financial statement.

¶72. Because we are remanding this case to the chancery court for revision of the equitable division of the parties' marital assets, we decline to rule on whether the chancery court correctly computed Jane's income. On remand, the parties should be afforded the opportunity to provide to the court not only their current Rule 8.05 financial statements, but they should be allowed to obtain and present any evidence to establish the veracity of the income and expense figures.

## V. Whether the chancery court erred in denying John's request for alimony.

¶73. "Awards of alimony are matters 'within the discretion of the Chancellor.'" *Oates v. Oates*, 291 So. 3d 803, 806 (¶3) (Miss. Ct. App. 2020) (quoting *Powers v. Powers*, 568 So. 2d 255, 257 (Miss. 1990)). "This appellate court will not reverse unless the Chancellor was manifestly in error in his finding of fact and manifestly abused his discretion." *Id*.

¶74. Marital fault for the divorce is not a bar to an award of alimony. *Hammonds v. Hammonds*, 597 So. 2d 653, 655 (Miss. 1992). Instead, fault becomes one of a number of factors the court may consider in determining if alimony is appropriate. *Id.; see also Warren v. Rhea*, 318 So. 3d 1187, 1192 (¶24) (Miss. Ct. App. 2021) (citing *Armstrong v. Armstrong*,

35

618 So. 2d 1278, 1280 (Miss. 1993) ("The Supreme Court has established a number of factors to guide courts in awarding alimony.")).

¶75. In *Thompson v. Thompson*, 894 So. 2d 603, 609 (¶34) (Miss. Ct. App. 2004), this Court articulated the general procedure for the chancery court to follow in determining alimony:

> First, the chancellor is to classify the parties' assets as marital or non-marital based on the court's decision in *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss.1994). Second, the chancellor is to value and equitably divide the marital property employing the *Ferguson* factors as guidelines, in light of each party's non-marital property. However, "[p]roperty division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Ferguson*, 639 So. 2d at 929. Third, if the marital assets, after equitable division and in light of the parties' non-marital assets, will adequately provide for both parties, then "no more need be done." Finally, if an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony should be considered. *Kilpatrick v. Kilpatrick*, 732 So. 2d 876 (¶16) (Miss.1999).

¶76. Given that this case is being remanded for the chancery court to re-evaluate and reform its equitable division of John and Jane's marital assets and debts, the need, if any, for alimony will also have to be re-assessed. Moreover, as noted above, on remand the chancery court can re-assess the current incomes of both parties. Accordingly, we make no ruling on John's request for alimony and remand that issue for further consideration by the chancery court after it makes its new equitable division of the parties' assets and debts.

## VI. Whether the chancery court erred in not reducing the amount of child support.

¶77. John argues that the chancery court erred when it did not reduce the amount he was required to pay in child support. John claims that pursuant to his and Jane's custody

36

arrangement, which the court approved and incorporated in its orders, he has custody of his boys thirteen nights of the month. Accordingly, John claims he is entitled to a downward deviation from the $743.15 amount for two children set by Mississippi Code Annotated section 43-19-101(1) (twenty percent of John's net income of $3,715.74).

¶78. The Mississippi statutory child-support guidelines provide that noncustodial parents should pay twenty percent of their adjusted gross income for two children. Miss. Code Ann. § 43-19-101(1) (Rev. 2015); *Plummer v. Plummer*, 235 So. 3d 195, 200 (¶22) (Miss. Ct. App. 2017). Sanctioned reasons for deviations from the statutorily set guidelines are found in Mississippi Code Annotated section 43-19-103 (Rev. 2015):

> The rebuttable presumption as to the justness or appropriateness of an award or modification of a child support award in this state, based upon the guidelines established by Section 43-19-101, may be overcome by a judicial or administrative body awarding or modifying the child support award by making a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined according to the following criteria:
>
> . . . .
>
> (g) the particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent's homemaking services.
>
> (h) Total available assets of the obligee, obligor and the child.
>
> . . . .
>
> (j) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

Deviations from the guidelines must be supported by written findings of fact. *Plummer*, 235 So. 3d at 201 (¶26).

¶79.    An example of a court-approved deviation because of the amount of time a parent spent with his children is found in *Gray v. Gray*, 909 So. 2d 108 (Miss. Ct. App. 2005). In that divorce case, the parties had four children. *Id*. at 110 (¶2). They separated in 2001, and the divorce matter was tried in October 2003. *Id*. at (¶3). The chancery court ordered the husband to pay child support of $160 per week or $640 per month, which exceeded the statutory amount of twenty-four percent of his adjusted gross income. *Id*. at 114 (¶29). The chancery court increased the monthly amount because the husband had visited the children only three times since the parties separated. *Id*. The husband challenged this ruling on appeal, and we affirmed the chancery court's rationale and upward deviation. *Id*. We reasoned, "[I]ndeed, it is logical that a parent will incur greater expense due to the non-custodial parent's failure to exercise visitation." *Id*.

¶80.    In *Plummer*, 235 So. 3d at 291 (¶26), we cited *Gray* in approving a downward deviation in child support. There, the husband had not visited with his special-needs child. *Id*. at (¶27). In a modification action, the chancery court reduced the husband's child support obligation by $100 for each month if he visited with his child for at least one week. *Id.* On appeal, we found the chancery court's action to be within its discretion. *Id.*

¶81.    In the case at hand, the chancery court approved a custodial arrangement that afforded John very liberal visitation, including extended weekends, so that he saw his boys every week. The chancery court itself pointed out that John had the boys with him thirteen nights

38

of the month—41.9% of a 31-day month or 43% of a 30-day month. As John notes, if he had the children two days more each month, then he would have been considered the primary custodian. But the chancery court refused John's request for a downward deviation for two reasons: first, because John had requested the visitation schedule, and second, because a downward deviation would be arbitrary and therefore potentially dangerous to the children. We find that the chancery court's reasoning was erroneous and not supported by the record.

¶82. It is clear that despite their personal animosity, John and Jane have supported and encouraged each other's relationship with their boys. Neither has stood in the way of the other seeing, visiting, and interacting with them. Moreover, it appears that John was exercising the visitation approved by the chancery court with no problems and with no harmful effect on the children. Jane clearly took advantage of the time John had the children by taking frequent trips with her friends. Importantly, both parties agreed to the visitation schedule. Thus, the chancery court was manifestly in error to say that John alone had requested this visitation. Moreover, such a reason to deny a deviation in child support contradicts the statute, which specifically states that deviations should be considered "where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent." Miss. Code Ann. § 43-19-103(g).

¶83. In addition, the chancery court failed to articulate why a deviation from the child support obligations would be "arbitrary" in this case. "'Arbitrary' means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment." *Attala Cnty. Bd. of Sup'rs*

39

*v. Miss. State Dep't of Health*, 867 So. 2d 1019, 1024 (¶18) (Miss. 2004). "We deem an act arbitrary when it occurs not according to reason or judgment, but occurs based on the will alone." *Carter v. Cleveland Sch. Dist.*, 118 So. 3d 673, 677 (¶17) (Miss. Ct. App. 2013). Indeed, here there was a clear reason to consider deviation from the child support guideline—the liberal visitation schedule itself. We said in *Gray* that it was logical that a custodial parent will incur a greater expense if the non-custodial parent fails to visit. *Gray*, 909 So. 2d at 114 (¶30). Conversely, in this case, it is logical that John, as the non-custodial parent, will incur greater expense due to his exercise of the agreed-upon visitation plan. It is also logical that Jane will have less expenses feeding and caring for the children while they are with John. Clearly, a downward deviation would not be "arbitrary" in this case.

¶84. Finally, there was no evidence in the record to support the chancery court's finding of possible harm to the children by reducing John's child support obligation. Even the chancery court itself did not cite any evidence of potential harm.

¶85. Jane argues that John's request should be denied because he has failed to voluntarily pay for the boys' extra-curricular activities. But John was never ordered to pay for extra-curricular expenses, only for medical-related or school expenses. There is no requirement in the statute that conditions deviations on a non-custodial parent's making additional voluntary payments. Jane also argues that John has attempted to "bamboozle" the court into believing that her income was higher. John's income has never been in dispute, nor has the fact that Jane (by her own admission) makes at least twice as much, if not more, than he does. Because we find that John's request for a downward deviation is meritorious, and because

40

the record does not support the chancery court's reasons for denying it, we find that the chancery court was manifestly wrong and abused its discretion in refusing John's request. We reverse the chancery court's denial of John's request and remand the matter for the chancery court to grant it and set a reasonably lower amount.

### VII. Whether the chancery court erred in its award of sanctions to Jane during the discovery process.

¶86. During the proceedings, John and his attorney were twice sanctioned by the chancery court for discovery abuses. The first was a $1,000 sanction that the court imposed on February 19, 2019, because John had failed to comply with an agreed order entered on October 17, 2018, to adequately supplement his interrogatory answers concerning the proposed testimony of the sixty potential witnesses he listed. John does not challenge this sanction in his appeal. But he does challenge the second $5,000 sanction that the chancery court later imposed when it later ruled that John and his attorney had shown bad faith during discovery.

¶87. Rule 37 of the Mississippi Rules of Civil Procedure allows for the imposition of expenses and sanctions by the trial court for discovery abuses. Mississippi Rule of Civil Procedure 37(b)(2) also authorizes sanctions:

> *Sanctions by Court in Which Action Is Pending*. If a party. . . fails to obey an order to provide or permit discovery, including an order made under subsection (a) of this rule, the court in which the action is pending may make such orders in regard to the failure as are just, and . . .

>> (D) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders.

41

In lieu of any of the foregoing orders or in addition, thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

¶88. "We review the trial court's handling of a motion for sanctions for abuse of discretion. 'This Court will reverse only where the trial court abused its discretion in imposing sanctions, so long as correct legal standards were employed.'" *Hodges v. Lucas*, 904 So. 2d 1098, 1102 (¶14) (Miss. Ct. App. 2004) (quoting *Leaf River Forest Prods. Inc. v. Deakle*, 661 So. 2d 188, 196 (Miss. 1995)).

We begin with a determination of whether the trial court applied the correct legal standard. *Pierce* [*v. Heritage Props.*, 688 So. 2d 1385, 1386 (Miss. 1997)]. If so, then we consider whether the trial court's "decision was one of several reasonable ones which could have been made." *Id*. We will affirm "unless there is a definite and firm conviction that the trial court committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Id.* (quoting *Cooper v. State Farm Fire & Cas. Co.*, 568 So. 2d 687, 692 (Miss. 1990)).

*Edwards v. Coca Cola Bottling Co. United Inc.*, 264 So. 3d 763, 768 (¶14) (Miss. 2019). "A willful violation of a discovery rule occurs when there is a conscious or intentional failure to comply with the rule's requirements. A finding of willfulness may be based upon either a willful, intentional, and bad faith attempt to conceal evidence or a gross indifference to discovery obligations." *Eaton Corp. v. Frisby*, 133 So. 3d 735, 748 (¶49) (Miss. 2013).

¶89. In this case, the chancery court imposed $5,000 in sanctions on John and his attorney for three reasons: (1) because it considered the untimely filing of John's answer without an order from the court to be part of a "broader pattern of conduct," (2) because John had failed to properly answer discovery concerning his sixty-three named witnesses, and (3) because

John had issued "a broad swath of subpoenas duces tecum." From these actions, the chancery court concluded that it was "reasonable to infer that John was motivated by ill will and a desire to alert as many people in the community as possible that the couple was undergoing contentious divorce litigation." Examining each of these, we find that the chancery court's basis for imposing sanctions was flawed or incorrect, and we are of the firm conviction that the chancery court erred in imposing the sanctions.

### A.     Untimely Filing of Answer

¶90.    From our review of the record, we hold that the chancery court abused its discretion in considering John's untimely filing of his answer to the complaint as part of a broader pattern of conduct warranting sanctions for several reasons. First, Jane withdrew her motion to strike John's answer *in toto* and sought only an order striking certain "offensive" references in it. Second, the chancery court found no merit to Jane's claim that even these certain portions of John's answer should be stricken. Third, the chancery court itself found that any error in John's late filing to be harmless and explained how John's attorney filed the pleading without obtaining an order from the court:

> The Court has reviewed the specific e-mails discussed by counsel. And upon receipt of Mr. Hornsby's correspondence and motion for leave to file his client's answer on April 11, 2019, the Court, through its staff attorney, e-mailed Ms. Nicholson, copied Mr. Hornsby, and asked if she had an objection to the entry of an order on Mr. Hornsby's motion. Ms. Nicholson responded that [John's] answer was untimely under the rules but that she would not object to a ten-day extension. She did question Mr. Hornsby's tardiness. So without further comment from the Court, Mr. Hornsby did file his answer and counterclaim.

In summary, Jane withdrew her motion to strike John's answer, and the chancery court

43

denied any modification to that motion. Consequently, there is no factual basis for the chancery court to have considered any actions of John or his attorney concerning the filing of John's answer as part of a broader pattern of conduct of bad faith warranting sanctions.

### B. John's Answers to Discovery

¶91. Jane propounded discovery on July 9, 2018, which John failed to answer. After Jane filed a motion to compel, the parties agreed to an order that required John to respond by October 28, 2018. One interrogatory requested the identification of every individual whom he expected to use as a witness and give a synopsis of each witness's expected testimony. John responded that he had not decided whom he would call as a witness. But he provided the names of sixty-three individuals that he might call, some with phone numbers and some no further information. On November 28, 2018, Jane filed another motion to compel which was heard by the chancery court on January 15, 2019. The court reviewed each of John's answers, including the one on the identification of witnesses, and ordered him to answer them more completely. Then, because this was Jane's second motion to compel, the chancery court ordered John to pay an attorney's fee of $1,000. John does not appeal the chancery court's February 15, 2019 order concerning this ruling.

¶92. On April 12, 2019, John's attorney supplemented his answers, providing some additional information about the sixty-three witnesses, but also said that "the above information is all the information that is currently in Defendant's possession. Defendant is working to accumulate the information requested herein and will do so as soon as possible. The days of phone books and merely looking someone's address up is no longer. The

44

Defendant is calling each possible witness to determine the testimony as requested and gathering address information." On April 18, 2019, without sending a good faith letter to alert John of any inadequacies in his April 12, 2018 supplemental responses, Jane filed a motion to strike John's "Answer" and a motion for sanctions for, inter alia, the failure to answer the interrogatories. The motion contained no specific information regarding how John's responses were inadequate; it merely said that John had been ordered to supplement his responses and that "the defendant has materially failed to do so." On May 21, 2019, John's new attorney further supplemented John's answers, whittling the number of witnesses down to thirty-three and providing a summary of the proposed testimony of each. At the October 2019 hearing on the sanctions matter that was ultimately held post-trial, no mention was made of John's final supplementation, which was provided well before the August 29, 2019 trial date.

¶93. The chancery court used John's failure to answer discovery to support its imposition of $5,000 in additional sanctions. But after Jane filed her motion for sanctions in April, John supplemented his answers in May. Jane made no claim that those answers were inadequate, nor did she give John notice of any specific deficiencies in his supplementation as required by Rule 1.10(c) of the Uniform Chancery Court Rules.[21] Therefore, prior to the trial and the belated hearing on Jane's motion for sanctions, John had cured any deficiencies. Jane did

---

[21] "No motion to compel shall be heard unless the moving party shall incorporate in the motion a certificate that movant has conferred in good faith with the opposing attorney in an effort to resolve the dispute and has been unable to do so. Motions to compel shall quote verbatim each contested request, the specific objection to the request, the grounds for the objection and the reasons supporting the motion." UCCR 1.10(c).

not present any evidence or argument that John's delay in providing adequate answers prejudiced her trial preparation in any way. *See Edwards*, 264 So. 3d at 769 (¶16) (Whether a party's trial preparation has been substantially prejudiced is a consideration when the court is contemplating dismissal of an action for discovery violation.). Sanctions are not proper when a party complies with a court's order. *See Laws v. Louisville Ladder Inc.*, 146 So. 3d 380, 386 (¶20) (Miss. Ct. App. 2014) ("The trial court herein erred by imposing sanctions, since the record reflects that Laws complied, as required by Rule 45 and Mississippi Code Annotated section 11-1-51, with the subpoena duces tecum."). Here John ultimately complied, reducing the number of witnesses and giving full and detailed information about each, three months before trial. Neither the chancery court nor the dissenting opinion acknowledge the adequacy of John's May 21, 2019 supplemental responses except to say they were untimely and filed a few days after the end of discovery. The discovery deadline did not eliminate John's obligation to supplement his discovery answers thereafter. Under Mississippi Rule of Civil Procedure 26(f)(2), a party has a duty to amend his or her responses to discovery even after the expiration of a discovery deadline. *Knapp v. St. Dominic-Jackson Mem'l Hosp.*, 89 So. 3d 561, 566 (¶18) (Miss. 2012).[22] Considering the evidence in the

---

[22] The dissent creates the impression that John gave other inadequate interrogatory responses by partially quoting John's response to a request that he provide a synopsis of his claims against Jane. The dissent implies that John merely said, "[Jane] has spent marital funds on luxury items such as diamond ring(s), [and a] high end trainer at over $250.00 per month (results not present)." But there was more to John's answer than this, as noted in the chancery court's order. Even there, the court only quoted part of John's answer, saying that John's answer stated:

> Plaintiff has spent marital funds on luxury items such as diamond ring(s), high end trainer at over $250.00 per month (results not present), luxury 'girls' trips

46

record, we find that the chancery court erred in considering John's alleged failure to respond to interrogatories as support for a finding of bad faith when it imposed additional sanctions.

### C.    Subpoenas Duces Tecum

¶94.    Jane filed her first Rule 8.05 financial statement on or about July 25, 2018. She listed her various monthly living expenses, including gas, electricity, telephone, church donations ($300), and realtor dues/cost ($500). She claimed a net monthly income after taxes of $7,673 and monthly expenses of $9,031.35, which included over $2,000 per month for such items as her personal medical expenses ($650), entertainment ($300); incidental and miscellaneous—extracurricular activities for the boys ($700),  pet expenses ($415), and a maid ($260).

¶95.    In March 2019, John issued subpoenas to Alliance Pest Control,  Animal Hospital of Orange Grove, Centerpoint Energy, Gulfport Water Department, Gulf Coast Association of Realtors, Hilton Dental Clinic, Mississippi Power Company, Trinity Methodist Church, and six of the parties' financial banking institutions. Additional subpoenas were issued to Jane's employer, Cameron's real estate company, Coast Electric Power, C-Spire, AT&T Mobile, and an individual called K.J. John subpoenaed his own records from CVS Pharmacy because Jane had accused him of taking a herpes drug that started with the letters "VAL," as well as Jane's pharmacy records because he claimed she had abused the prescription medication she

---

to Florida, New Orleans, various sites in Mississippi to 'play ' tennis and drink copious amounts of wine as provided in the information from Bayou Bluff Tennis Club, plastic surgery for purely vain cosmetic reasons and clothes and shoes.  Plaintiff secretly kept a separate bank account for the entirety of [the] marriage, and while [John] struggles to meet the bills, Plaintiff was living high on [the] hog, specifically. . . .

had received for her various cosmetic procedures. John also subpoenaed records from Bayou Bluff Tennis Club to reflect Jane's expenditures for her membership and activities there and Jane's medical records from the doctors she had seen (Dr. Mallett, Dr. Conger, Dr. Wyble, and Dr. Allen). In total, John had twenty-eight subpoenas issued between March and July of 2019.[23] Thereafter, Jane filed a revised Rule 8.05 financial statement on July 25, 2019.

¶96. From testimony at trial and argument during the hearing on the motion for sanctions, the subpoenaed information established that Jane's monthly church contribution prior to July 2018 was in fact $100, not $300. Moreover, the subpoena to the realtor association revealed that their dues were $500 per year, not per month. Jane's revised Rule 8.05 financial statement showed reduced monthly church donations (now $100 per month), reduced pet expenses (now $140 per month), and reduced realtor dues/costs (now $180 per month). She also reduced her personal medical expenses to $300 and the pest control expense went down from $65 per month to $60.

¶97. It is clear to this Court that John's subpoenas played some part in Jane's revision of her Rule 8.05 financial statement. The chancery court, however, faulted John for their issuance. The chancery court inferred a nefarious motive and intent on John's part because the chancery court determined that John could have obtained information on his own from any account he held jointly with Jane or that he could have asked Jane in discovery to verify her expenses. Moreover, the court found that John used only a small percentage of the

_____

[23] One subpoena to Dr. Pam Cutrer was a deposition subpoena. The record does not reflect whether this deposition was taken.

documents subpoenaed at trial. We find that these reasons are unfounded. Just because a party has a joint account and can obtain documents, in a trial setting a prudent attorney would subpoena information, even if only to verify the authenticity of the documents produced. Moreover, because Jane filed a revised Rule 8.05 financial statement and voluntarily corrected the inaccuracies, John did not have to use as many documents as he may have received. The fact that he did not have to use them should not be held against him.

¶98. The chancery court said that because John could have verified the expenses on the Rule 8.05 financial statement without involving third parties, "it is reasonable to infer that [John] was motivated by ill will and a desire to alert as many people in the community as possible that [he] was undergoing [a] contentious divorce." But there is evidence to the contrary that makes such an inference of ill will not reasonable. First, each subpoena had a legitimate purpose: to verify the expenses Jane claimed, to secure medical records for the medical assertions Jane made, to determine her income, or to obtain evidence of John's claims against Jane (e.g., subpoenaing pharmacy records to establish his claim of prescription abuse). Second, there is no requirement under our rules that a party must propound interrogatories or requests for documents to the other party before issuing a subpoena. Third, most of the subpoenas were issued to businesses (banks, an animal hospital, the water department, the power company, a telephone company, medical offices, pharmacies, Jane's employer, etc.). Only two were issued to individuals—to K.J. and Nolan (Jane's personal trainer) whose expense Jane did not include on her Rule 8.05 financial statement. Although Jane testified about her embarrassment over the issuance of these subpoenas, she presented

no other evidence or testimony to corroborate this alleged experience. Without discounting her testimony, as the dissent believes we do, we find that the legitimate purposes of the subpoenas outweigh Jane's concerns. For example, her saying that she did not want to be on the real estate commission's radar is far outweighed by the legitimate need to verify the fees that the commission charged. Moreover, Jane did not seek, nor did her attorney ever file, any motion to quash the allegedly embarrassing subpoenas as was her right under Mississippi Rule of Civil Procedure 45(d)(2)(c).[24]

¶99.    Given the circumstances of this case, we find that the that the chancery court abused its discretion in imposing the $5,000 in sanctions. Jane in fact withdrew her motion to strike John's untimely answer, and the chancery court denied Jane's oral request for modification of it at the hearing. Concerning the discovery responses, John had already been sanctioned once for failing to adequately supplement his answers, and Jane did not specifically identify where or how his final supplementation was still inadequate. Finally, there were justifiable reasons for John's subpoenas, and Jane took no action to quash them. The evidence does not support a finding that John acted with ill will or bad faith in issuing them. Therefore, we

_____

[24] "The court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (i) quash or modify the subpoena if it is unreasonable or oppressive, or (ii) condition the denial of the motion upon the advance by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things." M.R.C.P. 45(d)(2)(c).

The dissent points out that Jane sought protective orders for five of the subpoenas issued, document subpoenas to AT&T, C-Spire, Hancock Bank, Dr. Pam Cutrer, and a trial subpoena to Dr. Wyble. Because the AT&T, C-Spire, and Hancock Bank subpoenas had been issued after the discovery deadline and had not been served, the chancery court granted Jane protective orders. The chancery court issued orders modifying the subpoenas to the doctors. The chancery court's actions showed that Jane could have sought relief from the allegedly embarrassing subpoenas as well, but she did not.

reverse the chancery court's order concerning the $5,000 in sanctions.

## Conclusion

¶100.   In this divorce case, we affirm the chancery court's opinion in part, reverse it in part, and remand for further proceedings.  We affirm the grant of divorce to Jane on the grounds of adultery, but we reverse the chancery court's finding that it was reasonable to conclude that John transmitted an STD to Jane.  We further reverse and remand the chancery court's opinion concerning its classification and equitable distribution of the parties' marital assets and debts.  We further reverse the chancery court's denial of John's request for a downward deviation from the statutory guideline setting the amount of child support and remand for the chancery court to set a reasonable lower amount.  Because John's request for alimony depends on an accurate assessment of the Jane's income as well as a proper equitable division of their assets and debts, we make no ruling on those issues and remand them to the chancery court for further action.  Finally, we reverse the chancery court's order of sanctions and its order that John pay the $1,038.40 bill for Jane's treatment for the condyloma, which she failed to prove he caused.

¶101.   **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**WILSON, P.J., GREENLEE, WESTBROOKS AND EMFINGER, JJ., CONCUR.  LAWRENCE AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.   CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  BARNES, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J.; LAWRENCE AND McCARTY, JJ., JOIN IN PART.  SMITH, J., NOT PARTICIPATING.**

**BARNES, C.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶102. I respectfully dissent from the majority's finding that the chancery court's order imposing the $5,000 sanction against John and his attorney constituted an abuse of discretion. "'The decision to award monetary sanctions is left to the discretion of the trial court,' and is reviewed for abuse of discretion." *Boatwright v. Boatwright*, 184 So. 3d 952, 961 (¶22) (Miss. Ct. App. 2015) (quoting *Hampton v. Blackmon*, 145 So. 3d 632, 634 (¶7) (Miss. 2014)). Absent "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors, the judgment of the court's imposition of sanctions will be affirmed." *Id*. (quoting *Hampton*, 145 So. 3d at 634 (¶7)).

¶103. "The imposition of sanctions for a discovery violation requires a determination of whether a failure to comply or lack of cooperation exists" *Laws v. Louisville Ladder Inc.*, 146 So. 3d 380, 386 (¶21) (Miss. Ct. App. 2014). I find the record supports the chancellor's determination that John's responses to the requests for witnesses' contact information and their anticipated testimony were "incomplete at best and flippant at worst." In the order imposing sanctions, the chancery court outlined the various discovery abuses by John and his attorney over the course of litigation. When asked to list all witnesses he expected to use at trial and to give the substance of their testimony, John's initial response contained over sixty names (some with phone numbers), but no information was provided regarding the content of their testimony. John later explained at trial, "I came up with the sixty witnesses in June thinking of anybody that *might* have something related to the case . . . . I was just putting people down who *could* have been, *might* have had something." (Emphasis added). John

gave no indication that he intended to call the majority of these witnesses at trial, and, in fact, John only called three witnesses out of the over sixty names listed. Although the majority acknowledges John's initial failure to file complete responses to the interrogatories, the majority reasons that Jane failed to specify why his responses "were inadequate" in her April 2019 motion to strike his answer. In most instances, it was obvious why the responses were inadequate, as part of the required responses were missing in their entirety. The majority further observes that John supplemented his responses shortly thereafter on May 21, 2019.[25] While John did provide a synopsis of each witness's testimony in that response, he still listed thirty-three witnesses, yet he only called three at trial. And this supplementation does not excuse the time and expense Jane incurred in trying to obtain that information prior to that time.

¶104. With regard to the chancery court's additional finding that some responses to the interrogatories were also "flippant," the court specifically noted certain supplemental responses. For example, in John's supplemental response to Jane's request for the list of potential witnesses, he remarked that "[t]he days of phone books and merely looking up someone's address up is no longer." Jane's counsel aptly argued at the hearing that John's response "sounds like a smart aleck answer" and provides no information. Also, in response to Jane's request for a synopsis of his claims, John responded, "[Jane] has spent marital funds on luxury items such as diamond ring(s), [and a] high end trainer at over $250.00 per month

---

[25] An agreed amended scheduling order, dated May 2, 2019, informed the parties that "[a]ll written discovery . . . shall be completed on or before May 14, 2019[.]" Therefore, John's supplemental responses on May 21 were untimely filed, as Jane argued in her June 5, 2019 motion to strike. Regardless, the court did not address these filings in the order.

53

(results not present)." "Under Mississippi Rule of Civil Procedure 37 and the inherent power of the trial court to protect the integrity of its process, the trial court has the broad authority to impose sanctions for abuse-of-discovery violations." *E.I. DuPont de Nemours & Co. v. Strong*, 968 So.2d 410, 414 (¶12) (Miss. 2007). Because the record supports the chancery court's findings with regard to the discovery, I find no error in the court's ruling.

¶105. I further find no manifest or clear error in the chancery court's determination that the subpoenas duces tecum issued by John and his attorney constituted an abuse "of the [c]ourt's discovery process and subpoena power" and used "primarily to embarrass and harass [Jane] rather than as a genuine tool of discovery." The test in determining sanctions with regard to the subpoenas duces tecum is "whether the subpoena was issued in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress." *SLM v. Clinton Pub. Sch. Dist.*, 677 So. 2d 737, 740 (Miss. 1996). As the majority acknowledges, there were twenty-eight subpoenas issued between March 2019 and July 2019—not only to the couple's banking institutions but also to their pest-control provider, veterinarian, dentist, church, Jane's local real-estate association, and her personal trainer, to name a few. More subpoenas were later issued as well, for a total of over forty subpoenas. The court first noted that John had "filed no returns of service for any of the entities served with the [s]ubpoena [d]uces [t]ecum." The court further reasoned that John was the joint account holder on several of the family's accounts (e.g., utilities and pest control); thus, he could have obtained the information "through the discovery process" without having to issue a subpoena. As Jane's counsel noted at the hearing, "I think the only one they need a subpoena for was her doctors, and we never

54

tried to prevent them from getting doctors' records."

¶106. The majority finds, however, that "each subpoena had a legitimate purpose." The majority particularly takes note of the fact that after the subpoenas were issued, Jane amended several line items (e.g., pet expenses, church donations, and realtor dues) in her second Rule 8.05 financial statement. The record shows that these amended changes resulted in a decrease of $813 to Jane's combined monthly expenses. But as the chancery court noted at the hearing, "everyone supplements their 8.05 in the course of litigation . . . [b]ecause their expenses change[;] . . . you can't just make insinuations" that Jane "changed the 8.05 because of the subpoena." Jane had also testified that her church donation decreased and that she cut back on her expenses to the real estate commission. John's counsel nevertheless continued to assert that "the need for the amendment was simply because it was one hundred percent fabricated[,] . . . and that fabrication led to [the chancellor] awarding her more money than she deserved." The court subsequently determined that Jane "rebutted this accusation, stating that any amendments to her 8.05 reflected normal fluctuations in her income and expenses as a realtor." Our Court has recognized, "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lindsey v. Willard*, 111 So. 3d 1260, 1264 (¶12) (Miss. Ct. App. 2013) (quoting *Barnett v. Oathout*, 883 So. 2d 563, 566 (¶6) (Miss. 2004)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Id*. (quoting *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14)

(Miss. Ct. App. 2004)).  Therefore, I cannot find, as the majority does, that "it is clear . . . that John's subpoenas played some part in Jane's revision of her Rule 8.05 financial statement."

¶107.  The majority also finds that "the legitimate purposes of the subpoenas outweigh" Jane's testimony regarding her embarrassment over the subpoenas, noting there was "no other evidence or testimony to corroborate this."  Jane testified, "When you get a call from your preacher asking why on earth would your husband subpoena to see if you've been tithing, it's embarrassing.  He wanted my church to know I was getting a divorce."  Regarding the subpoena sent to the state's real estate commission, she also testified that the commission has "stringent guidelines," and she did not "want to be on their radar."  Jane further responded on cross-examination, "You've had every opportunity in the past sixteen months to – he has fished with forty-five subpoenas.  He has called family and friends.  He said in his counterclaim where he has sixty-three people listed as possible witnesses, where he was, at that time, trying to form a case against me."  As discussed above, "to the extent that the [chancery court's] finding turns on conflicting testimony and the credibility of the witnesses, we are without authority to second-guess [the] ruling because the [court] alone has the authority to decide what the disputed testimony shows." *Patrick v. Boyd*, 198 So. 3d 436, 443 (¶25) (Miss. Ct. App. 2016).  Lastly, despite the majority's observation Jane did not seek to quash any subpoena, the record shows that she did file five motions for protective orders in response to certain subpoenas (e.g., AT&T, C-Spire, and Hancock Bank).  Cameron Bell, Jane's boss, additionally testified that compliance with what was requested in the subpoena

(almost six years of information) would have taken "a minimum of 40 to 60 hours of [his] time" and would have required him to provide clients' confidential information.

¶108. As the court concluded, "Rule 45 explicitly provides for sanctions against the [p]arty 'issuing a vexatiously over broad subpoena.'" (Internal quotation marks added) (quoting *SLM*, 677 So. 2d at 739). And our courts "can employ our common sense regarding the time, trouble and effort involved in defending such proceedings, including most certainly reasonable and necessary out-of-court pretrial and trial preparation efforts." *Tricon Metals & Servs. Inc. v. Topp*, 537 So. 2d 1331, 1337 (Miss. 1989). I agree with the chancery court's ruling that John's "willful[] abuse[]" of "subpoena power," coupled with his dilatory responses to discovery, warranted the imposition of sanctions in this case.

¶109. Accordingly, I would affirm the chancery court's decision to impose the $5,000 monetary sanction. As to all remaining issues, including the decision to remand for further findings on equitable distribution and alimony,[26] I concur.

**CARLTON, P.J., JOINS THIS OPINION. LAWRENCE AND McCARTY, JJ., JOIN THIS OPINION IN PART.**

---

[26] *See McKissack v. McKissack*, 45 So. 3d 716, 723 (Miss. Ct. App. 2010) (recognizing then when remanding to chancery court to revisit equitable distribution, the court also must address alimony, as those issues "are intertwined").